## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| KIA AMERICA, INC.,<br><br>    Plaintiff<br><br>  v.<br><br>DMO AUTO ACQUISITIONS, LLC f/d/b/a Dan O'Brien Kia of Concord, DMO NORTH HAMPTON, LLC f/d/b/a Dan O'Brien Kia of North Hampton, DMO NORWOOD LLC f/d/b/a Dan O'Brien Kia Norwood, DMO METHUEN LLC d/b/a Dan O'Brien Chrysler Dodge Jeep Ram, DMO CLAREMONT, LLC f/d/b/a Dan O'Brien Subaru of Claremont, DMO HANOVER LLC f/d/b/a Dan O'Brien Infiniti of Hanover,  DAN O'BRIEN, and TOM KUHN,<br><br>    Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Kia America, Inc., for its Complaint against Defendants DMO Auto Acquisitions, LLC f/d/b/a Dan O'Brien Kia of Concord, DMO North Hampton, LLC f/d/b/a Dan O'Brien Kia of North Hampton, DMO Norwood LLC f/d/b/a Dan O'Brien Kia Norwood, DMO Methuen LLC d/b/a Dan O'Brien Chrysler Dodge Jeep Ram, DMO Claremont, LLC f/d/b/a Dan O'Brien Subaru of Claremont, DMO Hanover LLC f/d/b/a Dan O'Brien Infiniti of Hanover, Dan O'Brien, and Tom Kuhn, alleges as follows:

## NATURE OF THE ACTION

1. This action seeks to recover money fraudulently obtained from Kia America, Inc. ("**KUS**") through Defendants' submission to KUS of retail delivery reports ("**RDRs**") containing

1

false information concerning the purported sales of new Kia vehicles. Scores of RDRs that Defendants submitted, or caused to be submitted, to KUS falsely represented that (1) a new Kia vehicle had been sold to a retail customer, when it had not been sold; (2) a new Kia vehicle had been sold to a particular retail customer, when it had not been sold to that customer; and/or (3) the purported transaction was a retail sale of a new Kia vehicle which entitled one of the Defendants to incentive payments from KUS, when it was not.

2.      The RDRs were the product of a fraudulent scheme orchestrated by Dan O'Brien ("**O'Brien**") and Tom Kuhn ("**Kuhn**"). O'Brien is an individual who owns and controls (or previously owned or controlled) various new motor vehicle dealerships, including: DMO Auto Acquisitions, LLC f/d/b/a Dan O'Brien Kia of Concord ("**DMO Concord**"), a former Kia dealership; DMO North Hampton, LLC f/d/b/a Dan O'Brien Kia of North Hampton ("**DMO North Hampton**"), a former Kia dealership; DMO Norwood LLC f/d/b/a Dan O'Brien Kia Norwood ("**DMO Norwood**" and, collectively with DMO Concord and DMO North Hampton, the "**O'Brien Kia Dealerships**"), a former Kia dealership; DMO Methuen LLC d/b/a Dan O'Brien Chrysler Dodge Jeep Ram ("**DMO Methuen**"), a Chrysler Dodger Jeep Ram dealership; DMO Claremont, LLC f/d/b/a Dan O'Brien Subaru of Claremont ("**DMO Claremont**"), a Subaru dealership; DMO Hanover LLC f/d/b/a Dan O'Brien Infiniti of Hanover ("**DMO Hanover**"), an Infiniti dealership; and DMO Chelmsford LLC f/d/b/a Dan O'Brien Nissan ("**DMO Chelmsford**"), a Nissan dealership. O'Brien referred to this collection of dealerships as the Dan O'Brien Automotive Group and/or the "**Dan O'Brien Auto Group**" (the name that will be used in this Complaint). While the Dan O'Brien Auto Group was not a legal entity, O'Brien had the title of Chief Executive Officer ("**CEO**") of the Dan O'Brien Auto Group, and Kuhn had the title of Chief Operating Officer ("**COO**") of the Dan O'Brien Auto Group.

3.      The Defendants' scheme was designed to enrich themselves by inducing KUS to rely on the RDRs, each of which falsely represented that one of the O'Brien Kia Dealerships had made a sale that was eligible for incentive payments, and to make such payments to the O'Brien Kia Dealership that submitted the RDR.

4.      The Defendants' scheme was designed to, and in fact did, cause KUS to make incentive payments to which the O'Brien Kia Dealerships were not entitled.

5.      KUS does not yet know the full scope of the O'Brien Kia Dealerships' false reporting but based on the discrepancy, in the period from January 2019 through July 2021, between the dealerships' actual new Kia vehicle inventory and the amount of new Kia vehicle inventory that the dealerships would have had if their RDRs had been accurate (see paragraph 85 below), KUS believes that the O'Brien Kia Dealerships submitted hundreds of false RDRs to KUS.

6.      In paragraph 115 below and Exhibit A annexed hereto, KUS has identified at least 280 RDRs that, according to the information currently available to KUS, contained false information.  Based on the submission of the listed RDRs, KUS has sustained damages of more than $500,000.  KUS believes that discovery will enable it to identify additional RDRs containing false information.

7.      Defendants' fraudulent RDRs have been a substantial factor in KUS incurring and, in fact, have caused KUS to incur such damages.  KUS was a target of the Defendants' scheme and its damages are directly related to and a natural consequence of the scheme.

8.      KUS was not the only victim of the Defendants' scheme.  The scheme also harmed the consumers who ultimately purchased the vehicles because the Kia express limited warranty begins to run on each vehicle when an RDR is submitted to KUS.  Moreover, by providing false information to KUS concerning the identity of the vehicle purchaser, Defendants created a risk

that the actual owner of the vehicle would not receive safety recall notices.  In addition, the scheme harmed other Kia dealers who were deprived of inventory allocation due to the O'Brien Kia Dealerships' false reporting.

## PARTIES

9.    Plaintiff KUS is a California corporation with a principal place of business at 111 Peters Canyon Road, Irvine, California.  KUS is the exclusive U.S. distributor of new Kia motor vehicles, parts, and accessories, including to the state of New Hampshire.

10.    Defendant DMO Concord is a New Hampshire limited liability company which previously operated as a Kia dealer at 158 Manchester Street, Concord, New Hampshire pursuant to a Kia Dealer Sales and Service Agreement (a "**Dealer Agreement**") fully executed as of September 15, 2017.  DMO Concord is sometimes referred to by its former Kia Dealer Code, "**NH016**."

11.    Defendant DMO North Hampton is a New Hampshire limited liability company which previously operated as a Kia dealer at 137 Lafayette Road, North Hampton, New Hampshire pursuant to a Dealer Agreement fully executed as of September 14, 2018.  DMO North Hampton is sometimes referred by its former Kia Dealer Code, "**NH017**."

12.    Defendant DMO Norwood is a Massachusetts limited liability company which previously operated as a Kia dealer at 105-107 Boston Providence Highway, Norwood, Norfolk County, Massachusetts pursuant to a Dealer Agreement fully executed as of February 1, 2019.  DMO Norwood is sometimes referred to by its former Kia Dealer Code, "**MA053**."

13.    DMO Methuen is a Massachusetts limited liability company which operates as a Chrysler, Dodge, Jeep and Ram dealer at 175 Pelham Street, Methuen, Massachusetts, and which has its registered address at 10 Al Paul Lane, Suite 102, Merrimack, New Hampshire.

14.     DMO Claremont is a New Hampshire limited liability company which operated as a Subaru dealer at 152 Charlestown Road, Claremont, New Hampshire, from in or about September 2018 until in or about September 2022.

15.     DMO Hanover is a Massachusetts limited liability company which operated as an Infiniti dealer at 2060 Washington Street, Hanover, Massachusetts, from in or about October 2019 until in or about November 2021, and which has its registered address at 10 Al Paul Lane, Suite 102, Merrimack, New Hampshire.

16.     Defendant O'Brien is a resident of New Hampshire.  He is or was at all relevant times the CEO, controlling owner, and operator of the O'Brien Kia Dealerships (DMO Concord, DMO North Hampton, and DMO Norwood) and defendants DMO Methuen, DMO Claremont, and DMO Hanover (the "**O'Brien Non-Kia Dealerships**"), as well as non-defendant DMO Chelmsford.

17.     Upon information and belief, Defendant Kuhn is a resident of the State of Tennessee.  He is or was at all relevant times the COO of DMO Concord, DMO North Hampton, DMO Norwood, DMO Methuen, DMO Claremont, DMO Hanover, and non-defendant DMO Chelmsford.  Kuhn had supervisory responsibility for each of the O'Brien Kia Dealerships and was at times referred to as the "General Manager" of each of the O'Brien Kia Dealerships.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the First and Second Claims for Relief arise under the laws of the United States and the other, non-federal claims alleged herein are so related to the federal claims that they form part of the same case or controversy, giving the Court subject-matter jurisdiction over the non-federal claims pursuant to 28 U.S.C. § 1367.

5

19.    This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship, as (a) KUS is a citizen of the State of California while (b) O'Brien is a citizen of the State of New Hampshire, (c) Kuhn is a citizen of the State of Tennessee, (c) DMO Concord is an LLC whose members are O'Brien, a citizen of the State of New Hampshire, and Emilio Jaguande, a citizen of the State of Tennessee, (d) each of DMO North Hampton, DMO Norwood, DMO Methuen, DMO Claremont, and DMO Hanover is an LLC whose sole member is O'Brien, a citizen of the State of New Hampshire.

20.    This Court may exercise personal jurisdiction over each of the Defendants pursuant to R.S.A. 357-C:2 because, as alleged further below, each of the Defendants has engaged, directly or indirectly, in purposeful contacts within the State in connection with the offering or advertising for sale of, or have had business dealings with respect to, a motor vehicle within this State.

21.    In addition, this Court may exercise personal jurisdiction over (a) DMO Concord, DMO North Hampton, DMO Norwood, DMO Methuen, DMO Claremont, DMO Hanover, and O'Brien, as each is a resident of this State and (b) Kuhn because, as alleged below, he committed tortious acts within the State and has therefore submitted himself to the jurisdiction of the courts of this State as to any cause of action arising from or growing out of his acts, as provided in R.S.A. 510:4.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.  In the alternative, venue is proper under 28 U.S.C.§ 1391(b)(3) because all Defendants are subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

### A.  The Dan O'Brien Auto Group

23.     O'Brien referred to the dealerships he owned as the Dan O'Brien Auto Group (sometimes referred to herein for brevity as the "**Group**").  Upon information and belief, the Dan O'Brien Auto Group was not a legal entity but rather a name under which the O'Brien operated and managed his collection of dealerships.

24.     The Dan O'Brien Auto Group included DMO Concord, which was an authorized Kia dealer from on or about September 15, 2017, until on or about November 21, 2023, when it closed on the sale of its Kia dealership assets; DMO North Hampton, which was an authorized Kia dealer from on or about September 14, 2018, until on or about June 5, 2023, when it closed on the sale of its Kia dealership assets; DMO Norwood, which was an authorized Kia dealer from on or about January 30, 2019, until on or about November 7, 2022, when it closed on the sale of its Kia dealership assets; DMO Claremont,  which operated as a Subaru dealer from in or about September 2018 until in or about September 2022; DMO Hanover, which operated as an Infiniti dealer from in or about October 2019 until in or about November 2021; DMO Chelmsford LLC, which operated as a Nissan dealer from in or about October 2019 until in or about May 2022; and DMO Methuen, which has operated as a Chrysler, Dodge, Jeep and Ram dealer in Methuen, Massachusetts from in or about August 2019 through the present, but which O'Brien contracted to sell in 2022 and which is currently subject to a notice of termination from its franchisor for committing warranty fraud.

25.     O'Brien, Kuhn, and other Group executives directed and managed the affairs of all of the dealerships in the Dan O'Brien Auto Group from offices at 10 Al Paul Lane, Merrimack,

New Hampshire and/or, in the case of Kuhn, sometimes by wire and/or mail transmission from Tennessee.

26.     In addition to Group CEO O'Brien and Group COO Kuhn, there were other individuals who had titles and responsibilities covering the entire Dan O'Brien Auto Group, such as the Director of Operations, the Chief Financial Officer, and the Controller.

27.     Upon information and belief, the finances of the dealerships in the Group were managed on a Group basis, *i.e.*, financial decisions were made based on the needs of the Group and the plans of its principal owner, Dan O'Brien, rather than on what was best for any individual dealership in the Group.

28.     For example, in 2019, in order to obtain a $3,000,000 loan to assist him in the acquisition of additional dealerships, O'Brien signed an agreement (i) promising that all of the dealerships in the Group (other than DMO Methuen) would use Axiom Product Management ("Axiom") as their exclusive provider of finance and insurance products and (ii) making each of the Group dealership parties liable for the breach of the exclusivity agreement by any of the other Group dealership parties. As a result of O'Brien's decision to thereafter breach the exclusivity agreement, a judgment was entered making each of the Group dealership parties to the agreement (and O'Brien himself) liable to pay Axiom $1,926,174.30.

29.     In addition, the vehicle inventory of all of the Group dealerships was controlled by O'Brien and other Group executives rather than by the on-site managers of the individual dealerships.  O'Brien and Kuhn could and did order the individual dealerships to transfer inventory from one dealership to another, including the transfer of new Kia vehicles from O'Brien Kia Dealerships to O'Brien Non-Kia dealerships and the transfer of those same vehicles back to O'Brien Kia Dealerships.

30.     O'Brien acquired the first dealership in the Group, DMO Concord, in 2017.

31.     *Automotive News* reported, in a 2018 interview, that O'Brien had told the publication that he "wants to own as many dealerships as he can."  Consistent with this stated desire, the Dan O'Brien Auto Group promoted itself as "New England's fastest growing automotive group!"  A June 2022 job posting for a "Regional Controller for New Hampshire and Massachusetts stated, "At Dan O'Brien Auto Group, our goal is to grow from 7 stores to 60."

32.     By late 2022, however, all of the franchised dealerships in the Group had been closed or sold or were up for sale.  O'Brien entered into an agreement to sell what is currently the only remaining franchised dealership in the Group, DMO Methuen, in 2022, but the purchaser backed out of the deal after learning that the dealership had admittedly submitted false warranty claims to its franchisor and had wrongfully received over $970,000 from its franchisor for those claims.

33.     DMO Methuen is currently under a notice of termination from FCA US, LLC ("**FCA**") based on, among other things, its commission of warranty fraud.  See *DMO Methuen, LLC d/b/a Dan O'Brien Chrysler Dodge Jeep Ram v. FCA U.S., LLC,* et al., No. 23-10724-GAO (U.S.D.C., Mass.).

34.     Despite his stated desire to acquire "as many dealerships as he can," O'Brien has disposed, or attempted to dispose, of all the franchised dealerships he previously acquired.

35.     Upon information and belief, O'Brien's decision to dispose of the dealerships was the result, in whole or in part, of his and his dealerships' fraudulent and unethical business practices.

36.     Indeed, KUS has recently learned that O'Brien was lying to and defrauding KUS from the very inception of DMO Concord and DMO New Hampshire.

37.     In the Dealer Agreement that O'Brien signed on behalf of DMO Concord on or about September 1, 2017, O'Brien represented that DMO Concord was owned 80% by O'Brien and 20% by Emilio Jaguande, "and no others.".

38.     KUS has recently learned, however, that O'Brien testified at a deposition in the Axiom lawsuit that DMO Concord is in fact owned 80% by O'Brien, 10% by Jaguande, and 10% by Mike Ferdinand, a person whose ownership interest was never disclosed to KUS.

39.     In the Dealer Agreement that O'Brien signed on behalf of DMO North Hampton on or about August 24, 2018, O'Brien represented that DMO North Hampton was owned 100% by O'Brien "and no others."

40.     KUS has recently learned, however, that O'Brien testified at the same deposition in the Axiom lawsuit that DMO North Hampton is in fact owned 95% by O'Brien and 5% by Ferdinand, whose interest in DMO North Hampton was never disclosed to KUS.

41.     In addition to the fraudulent RDR scheme thereafter perpetrated against KUS, DMO Concord perpetrated a consumer fraud scheme against Kia customers and, as stated above, DMO Methuen perpetrated a warranty fraud scheme against its franchisor.

42.     The fraudulent schemes emanating from the Dan O'Brien Auto Group had a common methodology – the falsification of documents and the transmission of the false documents by wire – and had multiple victims.

43.     KUS was the most direct victim of the Defendants' fraudulent RDR scheme as KUS paid the O'Brien Kia Dealerships, collectively, hundreds of thousands of dollars to which they were not entitled.

44.     Other Kia dealers were also victims of the fraudulent RDR scheme because, by inflating their sales and thereby understating their new Kia vehicle inventory, the O'Brien Kia

Dealerships received allocation of new Kia vehicles that would otherwise have gone to other Kia dealers during a time when the demand for new Kia vehicles exceeded the supply.

45.   Consumers were also victims of the fraudulent RDR scheme because the warranty on a Kia vehicle normally begins to run from the sales date listed on the RDR.  By submitting, or causing to be submitted, an RDR with a sales date that pre-dates the actual sale of the vehicle, any customer who later purchased the vehicle would be purchasing a vehicle that (from the customer's perspective) had a truncated warranty period.

46.   Consumers were also victims of other fraudulent schemes by the Dan O'Brien Auto Group.  For example, during the years 2019 and 2020, DMO Concord regularly engaged in unfair and deceptive acts or practices in violation of state consumer protection laws.

47.   KUS learned of DMO Concord's consumer fraud through a December 20, 2022 article in *Automotive News,* the top trade publication for the auto industry, which reported that the Attorney General of the State of New Hampshire had (a) conducted an investigation of consumer complaints about unfair or deceptive acts or practices committed by DMO Concord in 2019 and 2020, (b) filed a Complaint in the Merrimack Superior Court against DMO Concord on December 19, 2022, based on his findings of "regular" violations of state law, and (c) obtained a Consent Decree pursuant to which DMO Concord was required to pay the State $1,250,000 and to comply with strict injunctive terms, including the installation of an independent monitor and the audio and video recording of all customer transactions over the next five years, to ensure that Kia customers were protected from similar mistreatment in the future.

48.   In addition to filing the Complaint, the Attorney General also issued a press release and gave a televised interview on December 19, 2022, confirming that his office had found that DMO Concord had engaged in the alleged conduct.

49.     The Attorney General's findings and the relief entered against DMO Concord were widely reported in the media, including in the *New Hampshire Union Leader*, the *Sacramento Bee*, *Automotive News*, and in December 19, 2022 televised broadcasts on ABC Channel 9, Manchester, New Hampshire, and NBC Channel 10, Boston, Massachusetts.

50.     On December 20, 2022, the Better Business Bureau ("BBB") revoked DMO Concord's BBB accreditation for failure to meet and abide by certain BBB standards, including the failure to "[b]e free from government action that demonstrates a significant failure to support BBB ethical principles."

51.     There were additional victims of another fraudulent scheme emanating from the Dan O'Brien Auto Group.  Between approximately April 2021 and September 2021, DMO Methuen submitted at least 2668 warranty claims falsely representing that it had replaced defective airbag inflators on customer vehicles when in fact it had failed to do so.  Based on the false submissions, FCA paid DMO Methuen over $970,000.  In addition, the consumers whose vehicles were falsely reported as having been repaired were put at risk of continuing to operate a vehicle with a defective airbag.

52.     Making false representations in order to obtain money to which they were not entitled was a way of doing business for the Dan O'Brien Auto Group.  All of the dealerships in the Group were operated and managed by O'Brien and Kuhn, who knew, or should have known, of their fraudulent activities.

**B.  Retail Delivery Reports ("RDRs")**

53.      It is the custom and practice in the auto industry for dealers to report the sale of new motor vehicles to their manufacturer or distributor through a "retail delivery report" or

"RDR."  The term "RDR" is often used in the industry as a verb or a gerund: *e.g.*, to submit an RDR is to "RDR the vehicle" and is sometimes referred to as "RDR'ing" the vehicle.

54.     KUS relies on its authorized dealers to timely furnish accurate sales information through the submission of RDRs when they sell new Kia vehicles.  KUS currently has 788 authorized dealers in the United States, and those dealers collectively retail hundreds of thousands of new Kia vehicles each year.  KUS does not independently verify the information in each RDR, but rather relies on its authorized dealers to report sales honestly and in good faith.

55.     An RDR provides KUS with several categories of important information, including but not limited to the following: the unique alphanumeric Vehicle Identification Number ("**VIN**") assigned to the vehicle; the name, address, telephone number, and (if available) email address of the purchaser; the date of sale; the mileage of the vehicle on the date of sale; the date on which the Kia express limited warranty for the vehicle begins to run; and the "Sales Type," e.g., whether the sale is a normal retail sale to a consumer or belongs in some other category, such as a broker sale.

56.     Kia dealers submit RDRs to KUS through KUS's online portal, WebDCS, and thus the RDR information is transmitted electronically from the dealer to KUS's servers in California, where the information can be accessed by KUS.

57.     KUS needs to receive timely and accurate RDRs from its dealers for a number of reasons.

58.     First, the National Traffic and Motor Vehicle Safety Act requires KUS to maintain a record of the first purchaser of each vehicle it produces, *see* 49 U.S.C. § 30117(b)(1).  This information is required for, among other reasons, safety recalls.

59.     Second, an accurate sale date is needed to determine when the Kia express limited warranty on the new Kia vehicle begins to run.  If, for example, a dealer reports the sale of a new

Kia vehicle to customer John Smith on March 1, but the first sale of that vehicle is actually made to Joe Jones on September 1, Mr. Jones will be purchasing a vehicle on which six months of the warranty have already expired (and KUS will not have his name and address for the purpose of any safety recall if the dealer fails to unwind the first RDR and submit a new RDR).

60.     Third, accurate sales reporting is needed to ensure a fair and equitable allocation of available new Kia vehicles among KUS's dealers.  The two principal factors that KUS uses in allocating vehicles are a dealer's reported sales and its available inventory.  False reporting of sales results in an overstatement of the dealer's sales and an understatement of its available inventory, thereby increasing the false reporting dealer's vehicle allocation at the expense of other Kia dealers.

61.     Fourth, as discussed below, accurate sales reporting is necessary to enable KUS to make incentive payments to Kia dealers who have earned them.

### C.  The Kia Incentive Programs

62.     During each month in which the O'Brien Kia Dealerships were in operation, other than the early COVID-19 pandemic months of April and May 2020, KUS offered its dealers a sales incentive program under which the dealer could earn a monetary incentive for each vehicle it retailed if it achieved its sales objective, or a percentage of its sales objective, for that month (the "**Incentive Programs**").  By achieving 110% of its monthly sales objective, the dealer could earn an additional amount for each vehicle it retailed during the month.

63.     During the COVID-19 pandemic months of April and May 2020, KUS did pay incentives but did not require dealers to achieve a sales objective to receive the incentives.

64.      The Incentive Programs are governed by, among other things, the rules located in KUS's Sales Policy dated March 3, 2015 (the "**2015 Sales Policy**"), which was subsequently

superseded by KUS's Sales Policy dated November 2, 2021 (the "**2021 Sales Policy**").  Most of

the RDRs in issue in this action were submitted when the 2015 Sales Policy was in effect.  The

2021 Sales Policy, however, did not make changes that are material to KUS's claims.  Accordingly,

the rules referred to herein will simply be referred to as the "**Sales Policy**."

65.     The Sales Policy prescribes rules for the reporting of sales and RDRs and defines

what constitutes "Eligible Sales" for which dealers can claim and receive monetary payments

under the Incentive Programs.

66.     Section 1.3(C) of the Sales Policy sets out the conditions that must be satisfied in

order for a dealer to submit a sale to KUS in connection with the Incentive Programs.  It states that

"[o]nly an Eligible Sale will trigger a Dealer's entitlement to incentive payments or otherwise

count towards fulfillment of a Dealer's retail sales objectives."

67.     "Eligible Sale" is defined as "[t]he sale or lease at retail directly to an Eligible

Customer of a new, unused Kia vehicle which sale or lease satisfies all of the . . . conditions" set

forth in Section 1.3(C), which include that the sale be to an "Eligible Customer" who "took

delivery of the vehicle within the applicable Incentive Program period and signed an enforceable

sales or lease contract."

68.     An "Eligible Customer" is defined in Section 1.3(A), in pertinent part, as "[a] bona

fide purchaser/lessee for value (whether an individual, organization, or family . . .) purchasing or

leasing a Kia vehicle for personal or commercial use, who has no intent to resell the vehicle for

profit, and who is not regularly engaged in the business of selling or leasing motor vehicles for

profit."

69.     Section 1.4(B) of the Sales Policy provides in part that "Sales to Brokers or

wholesalers – or sales made with the involvement or assistance of such person or entities – are not

Eligible Sales and must not be reported as such to [KUS]" and that "[a] Broker includes . . . any person who purchases a Kia vehicle with the intent to resell it."

70.     Section 1.5(C) of the Sales Policy sets out requirements for submitting RDRs, which include that "[the] Dealer must use the correct Sale Type" and "must provide the Eligible Customer's correct full name, address, telephone number, and email address, and must otherwise provide complete and accurate information."

71.     Section 1.12 of the Sales Policy states that "[b]y reporting the Retail Sale, the Dealer represents to [KUS] that the vehicle is eligible for the applicable Incentive Program and requests payment in compliance with the Program Rules."

72.     Section 1.6 of the Sales Policy states that "[a] Dealer must keep on file for inspection and audit by [KUS] authorized representatives all Sales Jackets, and all documentation relating to any Kia sales transaction, for the greater of five (5) years from the Sale Date, or any longer period required by applicable law" and that "[t]he documentation must, in all cases, be sufficient to demonstrate that Dealer complied with any applicable requirements of this Sales Policy, the Bulletin, and the Program Rules."  KUS requires its dealers to maintain a number of documents in the Sales Jacket, including the "fully executed bill of sale, buyer's order and/or finance contract," "[f]ully executed and completed Incentive Program claim form(s)," and "[p]roof of funding/payment" including "all documents relating to the financing and/or payment for the vehicle."

73.     Section 1.7 of the Sales Policy requires Dealers to notify KUS when a reported sale has been canceled or reversed and provides that any incentives based on the original reporting of the sale will be charged back to the Dealer.  It further provides that a Dealer's failure to timely notify KUS of the reversal or cancellation of a sale previously reported "is a violation of this Sales

Policy and a breach of the Dealer's obligation under the Dealer Agreement to timely furnish accurate sales information" and "will be deemed the submission by Dealer of false information to [KUS]."

## D.  Discovery of the Fraudulent RDR Scheme

74.     KUS first learned that the O'Brien Kia Dealerships may have been engaged in submitting RDRs for vehicles that remained in their inventory as a result of visits to DMO Norwood and DMO Concord on June 8-10, 2021, by a KUS auditor.

75.     During these visits, KUS inspected the Kia vehicle inventory on the lots of DMO Norwood and DMO Concord pursuant to its rights under, among other provisions, Article IX.A.8 of Part 2 of the Dealer Agreement ("DEALER shall allow persons designated by COMPANY, at all reasonable times and intervals, to examine DEALER'S facilities, stocks, Kia Products and used vehicles . . . .").

76.     In its inspection at DMO Norwood, Kia found that there were 22 Kia vehicles on the lot that had previously been reported as retail sales by DMO Norwood and eight (8) vehicles that had previously been reported as retail sales by DMO Concord.

77.     In its inspection at DMO Concord, KUS found that there were 22 vehicles on that lot that had previously been reported as retail sales by DMO Concord, one (1) new Kia vehicle that had previously been reported as a retail sale by DMO Norwood, and three (3) new Kia vehicles that had previously been reported as retail sales by DMO North Hampton.

78.     Following its on-site visits, KUS asked DMO Norwood and DMO Concord to provide an explanation as well as complete documentation concerning the purported transactions in which the vehicles that remained on the lots had previously been sold.  However, satisfactory

explanations and complete and/or satisfactory documents were not provided for most of the transactions.

79.     KUS's on-site inspection could only uncover evidence of falsely reported sales of vehicles that happened to be on the dealership lots at the time of the June 8-10, 2021 visits.  Any vehicles that the O'Brien Kia Dealerships had previously RDR'd without making an actual retail sale, but which were thereafter sold (and not reported in a second RDR) prior to June 8-10, 2021, could not have been detected by the inventory KUS took on those dates.  In addition, as alleged below, O'Brien and Kuhn orchestrated the relocation of numerous Kia vehicles from one Group lot to another shortly before the on-site audits took place.

80.     Following the visits to DMO Norwood and DMO Concord on June 8-10, 2021, KUS conducted an on-site inventory and audit at DMO North Hampton on October 28, 2021.  By that date, however, Defendants had had several months to remove any Kia vehicles previously reported as sold from the dealership lots.  In fact, between late May 2021 and July 2021, O'Brien and Kuhn had ordered the sale of over 100 Kia vehicles to VRCG, Inc., a vehicle wholesaler, many of which had previously been falsely reported to KUS as having been sold in retail sales.

81.     As a result of the vehicles found at DMO Norwood and DMO Concord dealerships, and the dealerships' failure to adequately explain why these vehicles had been reported as having been sold, KUS concluded that the O'Brien Kia Dealerships had been involved in false sales reporting and issued notices of termination to each of the dealerships on January 28, 2022.

82.     DMO Concord and DMO Norwood filed protests with the New Hampshire Motor Vehicle Industry Board (the "Board").  The filing of the protests resulted in an automatic stay of termination.

83.    DMO Norwood filed an action challenging its termination in Massachusetts state court, and KUS removed that action to the United States District Court for the District of Massachusetts.  KUS agreed to a stay of termination while that action was pending.

84.    As a result of a review of publicly available information concerning vehicle sales and registrations and of documents obtained – over the objection of the O'Brien Kia Dealerships and only after KUS successfully moved to compel production – in the Board protests and the District of Massachusetts action, KUS has discovered that the O'Brien Kia Dealerships' false reporting took place over an extended period of time, involved scores of new Kia vehicles, and took various forms.

85.    KUS has discovered that, at all times between January 2019 and July 2021, there was a substantial discrepancy between (a) the number of new Kia vehicles the O'Brien Kia Dealerships had in inventory and (b) the smaller number they would have had in inventory had the RDRs they submitted to KUS been accurate.  At times, that discrepancy exceeded 350 new Kia vehicles.  The following chart illustrates the discrepancy by comparing (i) the number of new Kia vehicles that the O'Brien Kia Dealerships would have had in inventory had their RDRs been accurate (the "KIA Data," the blue line) with (ii) the Dealerships' new Kia inventory according to the Dealerships' available Financial Statements (the red line) and (iii) the Dealerships' new Kia inventory according to what the Dealerships reported to their floorplan lender (the "Floorplan Statements," the green line).  The red line is broken during months in which one or more of the O'Brien Kia Dealerships failed to submit a financial statement:



86.     As can be seen in the above chart, the KIA Data and the Financial Statements report similar levels of inventory prior to 2019 and after 2021.  Between January 2019 and June 2021, however, the Financial Statements and Floorplan Statements show that the dealerships had much higher levels of new Kia inventory than what they would have had if the RDRs they submitted to KUS had been accurate.

87.     The reason for the discrepancy is that the O'Brien Kia Dealerships submitted RDRs reporting the purported retail sale of scores of vehicles that had not actually been sold to any retail customer and remained in their inventory.

88.     As can be seen from the chart in paragraph 85 above, the discrepancy was substantially reduced soon after KUS conducted its on-site audits at DMO Norwood and DMO Concord in June 2021.  In fact, O'Brien and Kuhn ordered the Group dealerships to wholesale

over 100 Kia vehicles shortly after they received notice that KUS would be conducting the audits. This vehicle sell-off substantially reduced the discrepancy between the O'Brien Kia Dealerships' actual new Kia vehicle inventory and their inventory as reported to KUS via the submitted RDRs.

### E.  The Role of the O'Brien Non-Kia Dealerships

89.     The O'Brien Non-Kia Dealerships acted as supposed retail purchasers of new Kia vehicles from the O'Brien Kia Dealerships to enable the O'Brien Kia Dealerships to claim entitlement to incentive payments.  These transactions were typically made at the end of a sales month to enable the O'Brien Kia Dealership to achieve its sales objective for the month.

90.     Pursuant to this practice, DMO Claremont purchased at least 54 new Kia vehicles from the O'Brien Kia Dealerships (36 from DMO Concord, 10 from DMO North Hampton, and 8 from DMO Norwood); DMO Methuen purchased at least 15 new Kia vehicles from DMO Concord; and DMO Hanover purchased at least 14 new Kia vehicles (2 from DMO Concord, 5 from DMO North Hampton, and 7 from DMO Norwood).

91.     It is not normal practice in the automotive business for a new motor vehicle franchisee to purchase new motor vehicles for which it does not have a franchise.  The O'Brien Non-Kia Dealerships could not lawfully re-sell the vehicles as "new" because they were not franchised Kia dealers.  Moreover, the market value of a vehicle typically decreases significantly when it goes from "new" to "used."

92.     The vehicles that were the subject of these intragroup transfers continued to be offered for sale to the public by the O'Brien Auto Group.  On certain occasions, a vehicle was re-transferred to an O'Brien Kia Dealership for purposes of making a sale to a consumer.  On information and belief, the purpose of transferring the vehicle back to the O'Brien Kia Dealership was to be able to sell the vehicle as "new."

93.    When a vehicle was transferred from an O'Brien Kia Dealership to an O'Brien Non-Kia Dealership, the vehicle was typically not registered with the applicable state motor vehicle department and the O'Brien Kia Dealership typically did not transfer title to the O'Brien Non-Kia Dealership.  When a transferred vehicle was sold to a consumer (or other ultimate purchaser), it was typically registered for the first time and the consumer (or other ultimate purchaser) was reported as the first purchaser of the vehicle – although the O'Brien Kia Dealership never reported that actual first purchaser to KUS.

94.    Thus, these purported sales to O'Brien Non-Kia Dealerships were nothing more than a means to fraudulently generate incentive payments from KUS.  While the Group may have documented the sale internally and had the purchasing dealership make a payment to the selling dealership, such payment merely amounted to transferring funds from one part of the Group to another part of the Group.  Title did not pass to the purchasing dealership and the vehicle remained subject to the Group's direction that the vehicle be transferred back to an O'Brien Kia Dealership.

95.    For example, on June 3, 2021, the week before the Norwood and Concord audits, O'Brien ordered the Group Controller to wholesale more than a dozen vehicles that had previously been "sold" by DMO Concord to other Group dealerships.  He specifically ordered that these vehicles be sold to the wholesaler "through [C]oncord."  Based on O'Brien's orders, the Group Chief Financial Officer directed the Controller to "move the vehicles back to Concord and sell them out of the [C]oncord dealership to keep things neat and clean."

96.    The O'Brien Kia Dealerships' reporting of these sales as "normal retail sales" was false and misleading in that the O'Brien Non-Kia Dealerships were not retail customers and sales to the O'Brien Non-Kia Dealerships were not Eligible Sales for incentive purposes.

97.     The O'Brien Non-Kia Dealerships were not Eligible Customers because they intended to and did offer the vehicles that they acquired from the O'Brien Kia Dealerships for profit and they were regularly engaged in the business of selling or leasing motor vehicles for profit.

98.     The O'Brien Non-Kia Dealerships acted as "purchasers" of new Kia vehicles that the Defendants desired to report to KUS as having been sold at retail in order to receive incentives to which the O'Brien Kia Dealerships were not entitled.

### F.   The Roles of O'Brien and Kuhn

99.     O'Brien and Kuhn had control over the vehicle inventory of the O'Brien Kia Dealerships and adopted policies that required O'Brien Kia Dealership employees to RDR vehicles before actual sales were made.

100.    O'Brien closely monitored the O'Brien Kia Dealerships' RDR'ing of vehicles and pressured O'Brien Kia Dealership employees to RDR vehicles "early" or else suffer penalties to their compensation.

101.    O'Brien and Kuhn adopted a policy requiring the O'Brien Kia Dealerships to RDR vehicles as soon as a deposit was received from a customer.  Kuhn confirmed this policy in an August 7, 2020 email after it was questioned by the General Manager of one of the O'Brien Kia dealerships.

102.    By mandating that O'Brien Kia Dealership employees RDR vehicles based solely on a deposit, O'Brien and Kuhn directed the RDR'ing of vehicles that had not yet been actually sold and therefore (a) might not be sold to the customer who made the deposit and who was therefore falsely reported to KUS as the vehicle's first purchaser; (b) might not be sold in the sales month for which the RDR was submitted, thereby potentially affecting the O'Brien Kia

Dealership's entitlement to incentives in that sales month; and/or (c) might not ever be sold to an Eligible Customer.

103.    The O'Brien Auto Group's "deposit only" policy was contrary to the Sales Policy, which requires that (i) there be a signed customer's order or bill of sale or a signed finance/payment contract and (ii) the vehicle be delivered to the Eligible Customer within the Incentive Program period.

104.    In an August 6, 2020 email, the Group Director of Operations informed each of the O'Brien Kia Dealership general managers that they would be docked $250 in salary for each RDR that was not submitted on a daily basis.  This email was copied to O'Brien and Kuhn who, on information and belief, came up with this policy.

105.    O'Brien and Kuhn were aware that the O'Brien Kia Dealerships had been  reporting the sale of vehicles that remained in inventory and, rather than put a stop to the practice and correct the false RDRs, had the dealerships retain the incentive payments to which they were not entitled. For example, on August 17, 2020, Kuhn ordered an inquiring employee not to reverse an RDR for a contingent vehicle sale that had been canceled.

106.    In a June 2020 email exchange with O'Brien, which was cc'd to Kuhn, a Group employee who had accounting responsibilities for the O'Brien Kia Dealerships complained that she was "being silenced" about various issues, including the fact that she "discovered managers RDR'ing vehicles for achievement and target bonuses that have not been sold and applying and receiving incentives such as customer cash and dealer cash on units that have not been sold." O'Brien forwarded the employee's email to the Group Controller (with a cc to Kuhn), directing the Controller to "go over this" with the employee because "I don't think she understands how Kia incentives work."

24

107.    O'Brien and Kuhn did nothing to address or correct the false reporting that the whistleblowing employee wrote about, and soon afterwards her employment ended.

108.    In addition, on information and belief, O'Brien and Kuhn were aware of the discrepancy between the number of Kia vehicles the O'Brien Kia Dealerships had in inventory and the number they would have had in inventory had their RDRs accurately reported sales to retail customers in light of their knowledge of and control over the vehicle inventory of the Dan O'Brien Auto Group dealerships.

109.    In the weeks prior to KUS's scheduled audits in June 2021, O'Brien and Kuhn directed (i) the transfer of dozens of Kia vehicles from one Group dealership lot to another and (ii) the sell-off to wholesaler VRCG of numerous Kia vehicles that had previously, and falsely, been reported to KUS as sold to retail customers.

110.    As a result of the sell-off, the discrepancy between the O'Brien Kia Dealerships' actual inventory and what their inventory would have been had their RDRs been accurate was substantially reduced by July 2021.  O'Brien's and Kuhn's actions demonstrate that they were aware of the discrepancy between the dealerships' Kia inventory and what the dealerships had previously reported as having been sold.

### G.  The Fraudulent RDRs

111.    From in or about January 2019 until at least December 2021, the Defendants engaged in a pattern and practice of submitting or causing to be submitted to KUS, by wire transfer, RDRs reporting the retail sale of new Kia vehicles when in fact (i) no sale had taken place; (ii) no sale had been made to the customer reported in the RDR; (iii) a vehicle was transferred to another O'Brien Auto Group dealership and the transaction was mischaracterized as a retail sale, even though the vehicle continued to be offered for sale to the public at the transferee dealership, at the

transferor dealership itself, and/or at another O'Brien Kia dealership; and/or (iv) the vehicle was sold to a wholesaler, broker, or fleet purchaser and mischaracterized as a retail sale.

112.    In each of the categories of false reporting identified in the previous paragraph, the false RDR was submitted to cause KUS to pay the reporting O'Brien Kia Dealership incentive money to which it was not entitled.

113.    In addition, the Defendants deliberately failed to report the reversal or cancellation of certain sales previously reported to KUS in order to dishonestly retain incentive payments to which they were not entitled.

114.    KUS does not yet know the full scope of the O'Brien Kia Dealerships false sales reporting.  Based on the information available to KUS at this time, however, KUS believes, and therefore alleges, that the O'Brien Kia Dealerships submitted at least the false RDRs described in the following paragraphs and the Exhibits annexed hereto.

115.    Exhibit A to this Complaint contains a list of (a) 201 RDRs submitted by DMO Concord to KUS by wire transfer containing false information that caused KUS to pay DMO Concord incentive money to which DMO Concord was not entitled; (b) a list of 24 RDRs submitted by DMO North Hampton to KUS by wire transfer containing false information that caused KUS to pay DMO North Hampton incentive money to which DMO North Hampton was not entitled; and (c) a list of 57 RDRs submitted by DMO Norwood to KUS by wire transfer containing false information that caused KUS to pay DMO Norwood incentive money to which DMO Norwood was not entitled.  For each RDR, Exhibit A sets forth (i) the VIN; (ii) the RDR date; (iii) the nature of the false information (i.e., sale not made at time reported, sale not made to customer identified, and/or sale mischaracterized as a retail sale) and (iv) the amount of incentive money that KUS paid for the identified vehicle in reliance on the false RDR.

26

116.    With respect to each of the RDRs listed on Exhibit A, KUS reasonably relied on the information provided by the O'Brien Kia Dealership in paying the listed amount for each transaction.

117.    The amounts set forth on Exhibit A do not account for all of the amounts paid out by KUS in reliance on false RDRs submitted by the O'Brien Kia Dealerships.

118.    First of all, KUS believes that it will be able to identify additional false RDRs once it obtains discovery from Defendants.

119.    In addition, the amounts set forth on Exhibit A are only the amounts paid for the specific vehicles identified by VIN.  They do not include amounts that KUS paid to the O'Brien Kia Dealerships for other new Kia vehicles sold during the same sales months in which the submission of the false RDRs enabled the O'Brien Kia Dealerships to appear to have achieved their monthly sales objectives and/or 110% of their monthly sales objectives.

120.    For example, on November 30, 2020, the last day of the November 2020 sales month, DMO Norwood submitted 15 RDRs representing that it had made retail sales (items 252 through 256 on Exhibit A).  Eight (8) of the vehicles were transferred to DMO Claremont (Dan O'Brien Subaru) and the other seven (7) were transferred to DMO Hanover (Dan O'Brien Infiniti). None of the vehicles was registered with the applicable state agency and title was not transferred to DMO Claremont or DMO Hanover.  The transferred vehicles were offered for sale to the public at DMO Claremont and DMO Hanover.  Seven (7) of the vehicles were later transferred to DMO Concord, which sold them to VRCG.  Others were transferred back to DMO Norwood or to DMO North Hampton, which sold them to retail customers.  KUS was not advised of the actual first purchaser of any of these vehicles.  As a result of DMO Norwood RDR'ing these vehicles on

27

November 30, 2020 as supposed "retail" sales, KUS paid DMO Norwood a bonus of more than $20,000 in addition to the amounts paid for the 15 vehicles.

121.   Similarly, the false information described on Exhibit A does not cover all of the false information provided by the O'Brien Kia Dealerships on the subject RDRs.

122.   For example, in 2021, DMO Concord submitted RDRs for nine (9) vehicles that it sold to wholesaler VRCG for which it had not previously submitted an RDR.  In addition to mischaracterizing these as retail sales, all of those RDRs contained fictitious email addresses and none of them contained the name of a contact person at VRCG but instead set forth the names of Group employees.

123.   Similarly, at the end of December 2021, DMO Concord submitted RDRs for seven (7) vehicles that it sold to Enterprise Car Rental.  In addition to mischaracterizing these as retail sales, none of the RDRs contained the name of a contact person at Enterprise but instead set forth the names of Group employees or, in one instance, the name "Abraham Lincoln."

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF – FEDERAL CIVIL RICO, 18 U.S.C. § 1962(C)**
**(Against All Defendants)**

124.   KUS repeats and realleges the preceding paragraphs as if fully set forth herein.

125.   This cause of action is asserted against all Defendants and is asserted in addition to and in the alternative to the other RICO Cause of Action contained herein.

126.   Section 1962(c) of Title 18 of the U.S. Code makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

28

127.    Each of the Defendants is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

128.    Each of the Defendants violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

(1)    **The Enterprise**

129.    The Defendants form an association-in-fact for the common and continuing purposes described herein and constitutes an enterprise within the meaning of 18 U.S.C.§ 1961(4) (the "Enterprise").

130.    Each of the Defendants are or have been employed by or associated with the Enterprise.

131.     The Enterprise functions or functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity and with a common purpose of selling and servicing motor vehicles.

132.    The Enterprise was, and is, distinct from each of the Defendants.  The goal of the Defendants' unlawful conduct was to obtain money and property to which the Enterprise was not entitled, including incentive payments from KUS for the retail sale of vehicles that were not in fact sold to a retail customer.

133.    The O'Brien Kia Dealerships submitted at least 282 RDRs containing false information, as alleged in paragraph 115 above and Exhibit A annexed hereto.  One of the O'Brien Kia Dealerships received an incentive payment for each of those sales, as set forth on Exhibit A. The purpose of this aspect of the Defendants' scheme was to deceive KUS into making payments to the O'Brien Kia Dealerships, which inured to the benefit of the Enterprise.

134.    In addition, certain of the sales reported by the O'Brien Kia Dealerships in the RDRs were mischaracterized as retail sales to make it appear that the O'Brien Kia Dealership had achieved its monthly sales objective and/or its monthly achievement bonus objective when it had not.

135.    The Enterprise has engaged in, and its activities have affected, interstate and foreign commerce.  The Group dealerships have purchased vehicles manufactured in, and shipped from, other states and countries, have sold and shipped vehicles to customers in multiple states, and have transferred vehicles across state lines from one Group dealership to another.  In addition, each RDR that the O'Brien Kia Dealerships submitted to KUS was submitted through KUS's online portal, WebDCS, and thus the information concerning vehicle sales was transmitted electronically from the O'Brien Kia Dealerships in New Hampshire and Massachusetts to KUS's servers in California, where the information was accessed by KUS.

(2)    <b>Pattern of Racketeering Activity</b>

136.    The Defendants, each of whom are persons or entities employed by or associated with the Enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).  The Defendants committed multiple predicate acts of racketeering that are indictable under the provisions of the U.S. Code enumerated in 18 U.S.C.§ 1961(1)(B), as more specifically alleged below.  The Defendants committed, or conspired with or aided and abetted other Defendants in committing, at least two such acts, one of which occurred after the effective date of the applicable statute, and the last of which occurred within ten years after the commission of a prior act of racketeering activity.  The acts of racketeering activity

span at least from January 2019 to December 2021.  The Defendants played the following roles in the racketeering scheme:

    a)    **O'Brien.**  O'Brien was and is the leader of the Enterprise.  He is the CEO of the Dan O'Brien Auto Group, and owns and operates the O'Brien Kia Dealerships and O'Brien Non-Kia Dealerships.  He provided capitalization to the O'Brien Kia Dealerships and O'Brien Non-Kia Dealerships, which allowed the Group dealerships to purchase vehicles from automobile manufacturers and distributors, including KUS.  In furtherance of the scheme, he relied on certain officers and employees of the O'Brien Kia Dealerships and the O'Brien Non-Kia Dealerships.  O'Brien regularly communicated with O'Brien Kia Dealership and O'Brien Non-Kia Dealership employees in connection with the scheme to defraud KUS of incentive payments.  O'Brien provided instructions to employees directly and through Kuhn to effectuate aspects of the scheme.  As the leader of the scheme to defraud, O'Brien committed, ordered to be committed, and/or aided and abetted acts of mail fraud and wire fraud.  As an owner of the Group dealerships, O'Brien benefited from the activities of the Enterprise, including the scheme to submit, or cause to be submitted, false RDRs to manufacturers and distributors, including KUS.

    b)    **Kuhn.**  Kuhn is the COO of the Dan O'Brien Auto Group and is second-in-command to O'Brien.  In that role, Kuhn had substantial authority and responsibility for the Group dealerships' operations.  Kuhn gave instructions to the O'Brien Kia Dealerships to RDR vehicles even before there were actual sales.  Kuhn was directly involved in the fraudulent submission of RDRs to KUS, as his

name was listed as the contact person for dozens of vehicles that were falsely reported as retail sales and, on information and belief, Kuhn personally submitted certain of the RDRs.  Kuhn was aware of the identity of the Kia vehicles that had previously been reported to KUS as having been sold at retail but which were still in the inventory of the Group's dealerships, and in May 2021 he directed the transfer of many of those vehicles from one dealership to another and arranged the logistics for selling to a wholesaler numerous Kia vehicles that had previously been reported to KUS as retail sales.

c)      **The O'Brien Kia Dealerships.**  Each of the three O'Brien Kia Dealerships was involved in the scheme to defraud KUS.  The O'Brien Kia Dealerships purchased vehicles from KUS.  The O'Brien Kia Dealerships then submitted RDRs to KUS for vehicles that were not sold and falsely reported sales to the O'Brien Non-Kia Dealerships, to a wholesaler, and to a fleet purchaser as retail sales.  The O'Brien Kia Dealerships were then paid, and retained, incentive payments from KUS.

d)      **The O'Brien Non-Kia Dealerships**.  Each of the O'Brien Non-Kia Dealerships acted as "purchasers" of new Kia vehicles to enable the O'Brien Kia Dealerships to falsely report retail sales and enable the Enterprise to receive unearned incentives from KUS for such sales.  The O'Brien Non-Kia Dealerships could not lawfully sell such vehicles as new vehicles and had no normal business reason for adding new Kia  vehicles to their inventory.  On information and belief, the O'Brien Non-Kia Dealerships also stored Kia vehicles that O'Brien Kia

Dealerships had previously RDR'd so as to evade discovery that the vehicles had not actually been sold.

137.    The Defendants' acts of racketeering were related in that they were all committed for the purpose of increasing revenue and, on information and belief, alleviating cash flow issues for the Dan O'Brien Auto Group.  Their acts of racketeering included the submission of RDRs reflecting retail sales that did not occur, obtaining and retaining incentive payments to which the O'Brien Kia Dealerships were not entitled, and reporting non-retail sales as retail sales at the end of the month in order to falsely claim achievement of monthly sales objectives.

138.    In order to implement the scheme, the Defendants used the interstate wires and/or mails.  The scheme defrauded KUS of incentive money to which the O'Brien Kia Dealerships were not entitled.  In addition, by their fraudulent acts, the Defendants forced KUS to incur significant costs in order to identify the vehicles involved in the scheme and the incentive payments that needed to be reversed because they were obtained and retained by means of fraud.  These acts, and others to be identified after further investigation and discovery, not only shared a common or related result, participants, and victim, but they also shared a common method of commission.

139.    The Defendants' acts of racketeering activity as set forth herein, each of which directly and proximately injured KUS, constituted a continuous course of conduct spanning a period from at least January 2019 to at least December 2021.  During that three-year period, Defendants committed over 280 predicate acts of wire fraud intended to induce KUS to pay the O'Brien Kia Dealerships money to which they were not entitled.  The temporal duration and the number of predicate acts are so extensive as to constitute a pattern of racketeering activity with "closed-ended continuity."

140.    Consumers were also victims of Defendants' fraudulent RDR scheme.  A consumer who purchased a new Kia vehicle that one of the O'Brien Kia Dealerships had previously RDR'd received a vehicle that had, from the consumer's perspective, a truncated warranty period.  And first  purchasers of vehicles whose identity Defendants failed to report to KUS were at risk of not receiving safety recall notices.

141.    In addition, the fraudulent RDR scheme was part of a larger pattern of racketeering activity in which, among other things, the Defendants used the interstate wires to submit at least 2,668 false airbag warranty claims to another franchisor and regularly defrauded Kia customers at DMO Concord.

142.    KUS's investigation of the Defendants' fraudulent  activities is ongoing, and KUS may uncover additional fraudulent schemes distinct from those set forth herein, and/or additional instances of fraud in connection with the same fraudulent schemes described herein.

143.    The conduct alleged herein involves a threat of repetition for an open-ended period yet to come because O'Brien and Kuhn continue to operate DMO Methuen and O'Brien has stated his desire to own as many new motor vehicle dealerships as possible.  In addition, each of the dealerships in the Dan O'Brien Auto Group promised all of its purchasers of new motor vehicles a Lifetime Powertrain Warranty to supplement the manufacturer's express limited warranty.  In order to perform the Lifetime Powertrain Warranty for the thousands of consumers who purchased new motor vehicles from the Group dealerships, Defendants will presumably need to remain in the auto dealership business in New Hampshire and/or Massachusetts in some shape or form for the indefinite future.

144.    Accordingly, Defendants' predicate acts were a part of a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

34

(3)    **RICO Predicate Acts**

145.    Each of the Defendants committed and aided and abetted the predicate acts described below in order to further the objectives of the Enterprise.

146.    O'Brien committed and aided and abetted the predicate acts described below in his individual capacity or through his ownership and control of the Dan O'Brien Auto Group, the O'Brien Kia Dealerships, and the O'Brien Non-Kia Dealerships.  O'Brien directly and indirectly committed or aided and abetted numerous predicate acts, or could reasonably have foreseen that predicate acts would be used in the ordinary course of business as a result of his actions in furtherance of the Enterprise.

147.    The predicate acts by the Group Dealerships were committed by representatives of those entities acting through, on behalf of and for the benefit of those entities and the Enterprise. Because of their relationship with O'Brien, and O'Brien's control over them, the Group Dealerships committed the predicate acts described below to further the aims of the Enterprise.

148.    The Defendants voluntarily and intentionally devised or participated in a scheme to defraud KUS, as set forth above.

149.    It was reasonably foreseeable that interstate wire communications would be used in connection with this scheme, particularly because the scheme involved interstate transactions and communications, including between and among the O'Brien Kia Dealerships and the O'Brien Non-Kia Dealerships (in New Hampshire and Massachusetts), and KUS (in California). In furtherance of the scheme, and as described herein, the Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343; and also caused matters and things to be placed in a post office or authorized depository or deposited or caused to be deposited matters or

things to be sent or delivered by a private or commercial interstate carrier in violation of 18 U.S.C. § 1341. The specific mailings and wirings in furtherance of the scheme to defraud include, but are not limited to, the following:

i)      Each of the 282 vehicles specifically identified in Exhibit A were reported to KUS (which the Defendants knew was located in California) as retail sales by the O'Brien Kia Dealerships through the submission of a RDR using KUS's online portal, WebDCS. At least 201 of those RDRs were submitted by DMO Concord, 24 were submitted by DMO North Hampton, and 57 were submitted by DMO Norwood. Each of these RDRs contained false information, as alleged above. Thus, KUS has identified at least 282 separate predicate acts of wire fraud committed by the O'Brien Kia Dealerships, each of which were in furtherance of the Enterprise's scheme to defraud KUS of incentive payments. The dates the RDRs were submitted to KUS are set forth in Exhibit A and are incorporated by reference herein.

ii)     KUS posted incentive credits to the accounts of the O'Brien Kia Dealerships based on the 282 false RDRs for the amounts set forth in Exhibit A. Each of those instances in which KUS credited the accounts of the O'Brien Kia Dealerships involved the transfer of information through interstate wires. Those payments were the result of Defendants' fraud. The credits – which the O'Brien Kia Dealerships caused KUS to make through their fraudulent submission of RDRs – likewise constitute predicate acts of wire fraud by the O'Brien Kia Dealerships in furtherance of the scheme. The incentive credits were typically posted to the applicable O'Brien Kia Dealership's account within the month following the month that the RDR was submitted.

150.    In engaging in the aforementioned mail and/or wire fraud, the Defendants knew and intended that KUS would reasonably rely on the their misrepresentations and omissions, which they intended would further their scheme to defraud KUS.  Specifically, the Defendants knew that KUS would rely on the RDRs in making incentive payments, and that the submission of RDRs would result in KUS crediting the O'Brien Kia Dealerships' accounts with incentive credits based on the RDRs.  The Defendants' intent was to defraud KUS of incentive payments, and the Defendants engaged in further fraud by attempting to cover it up, including by transferring Kia vehicles between dealerships and wholesaling Kia vehicles in the days leading up to the audits. As a result of Defendants' fraud, KUS paid incentive payments to the O'Brien Kia Dealerships to which they were not entitled, and KUS thereafter incurred substantial costs auditing and otherwise investigating the O'Brien Kia Dealerships.

### (4)    Causation and Damages

151.    The unlawful actions of the Defendants directly, illegally, and proximately caused and continue to cause injuries to KUS in its business and property.  In furtherance of their scheme and through fraudulent acts, the Defendants caused KUS to make incentive payments to the O'Brien Kia Dealerships to which they were not entitled.  But for the Defendants' submission of RDRs for vehicles that were not actually sold to retail customers as indicated in the RDR, KUS would not have made incentive payments for those reported sales.  And but for the Defendants' fraudulent retention of incentive payments, KUS would not have had to incur substantial audit and other investigation costs to uncover the fraud.

152.    It was reasonably foreseeable to the Defendants that their scheme would defraud KUS.  The Defendants understood that the submission of RDRs for retail sales would result in KUS posting incentive credits for those reported sales.  In fact, the Defendants specifically

submitted RDRs knowing that the sales either were not final, were not real, were not made to the person identified as the purchaser, or were not Eligible Sales, and did so in order to receive incentive payments to which they were not entitled.  The Defendants then retained the incentives rather than correct the inaccurate RDRs.

153.    KUS has taken chargebacks (or reversed) certain of the incentive payments to which it later determined the O'Brien Kia Dealerships were not entitled.  However, KUS has not charged back most of the incentive payments identified in Exhibit A and, on information and belief, the incentive payments KUS has identified to date do not represent all of the incentive payments to the O'Brien Kia Dealerships that were the result of fraud.  KUS expects to uncover additional incentive payments that were obtained by means of fraud, and may also uncover other damages it has sustained in connection with the Defendants' fraud.

154.    Pursuant to the civil remedy provisions of 18 U.S.C.§ 1964(c), KUS is thereby entitled to recover three times the damages it sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## SECOND CLAIM FOR RELIEF – FEDERAL CIVIL RICO, 18 U.S.C. § 1962(D)
### (Against All Defendants)

155.    KUS repeats and realleges the preceding paragraphs as if fully set forth herein.

156.    This claim is asserted against the Defendants and is asserted in addition to and in the alternative to the other RICO claim contained herein.

157.    Section 1962(d) of Title 18 of the U.S. Code makes it illegal for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  The Defendants have each unlawfully, knowingly, and willfully combined, conspired, confederated,

and agreed together and with others to violate 18 U.S.C.§ 1962(c) as described above, in violation of 18 U.S.C.§ 1962(d).

158.    Each of the Defendants knew of the illegal activity.  As the CEO of the Dan O'Brien Auto Group and principal owner and operator of the O'Brien Kia Dealerships, O'Brien knew that the O'Brien Kia Dealerships were submitting RDRs for vehicles that were not in fact sold, and collecting incentive credits to which they were not entitled.  He also knew that reporting vehicles as retail sales at the end of a sales month would result in larger incentive payments, and was involved in directing the O'Brien Kia Dealerships to report sales at the end of the sales month, even in cases where the cars were not in fact sold during the sales month.  O'Brien directed and caused the O'Brien Kia Dealerships to engage in this misconduct for the purpose of defrauding KUS of incentive payments, increasing revenues for the Dan O'Brien Auto Group, and, on information and belief, alleviating cash flow issues.  O'Brien's knowledge and intent may be imputed to the O'Brien Kia Dealerships, which at all times were under the control of O'Brien.

159.    Each Defendant knew that he or it was committing numerous RICO predicate acts in support of the scheme.  Each Defendant understood that he or it was participating in a racketeering scheme, evidenced, *inter alia*, by his or its involvement in submitting inaccurate RDRs reflecting retail sales that had not occurred in order for the O'Brien Kia Dealerships to receive incentive credits from KUS to which they were not entitled, submitting inaccurate RDRs reflecting retail sales at the end of the month even though the sales had not occurred in order for the O'Brien Kia Dealerships to receive incentive payments from KUS to which they were not entitled, and transporting and attempting to sell off Kia vehicles in the days before the audits in order to conceal the fact that vehicles that the O'Brien Kia Dealerships had previously reported as sold were still in the dealerships' inventory.

160.    As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by conducting and participating in the conduct of the affairs of the Enterprise described above through a pattern of racketeering activity.  Each Defendant agreed to further the scheme.

161.    Further evidence of an agreement among the Defendants is peculiarly within the knowledge and control of the Defendants.

162.    The participation and agreement of each Defendant was necessary to allow the commission of the pattern of racketeering activity described in the First Claim for Relief.  O'Brien's participation was necessary because he was the leader and primary orchestrator of the scheme to defraud Kia.  Kuhn's participation was necessary because he was the principal executive who carried out O'Brien's orders.  For the scheme to succeed, each of the O'Brien Kia Dealerships needed to submit RDRs, including at the end of the month, in order to maximize sales incentive payments from KUS.  Each of the O'Brien Non-Kia Dealerships had to "purchase" and accept into their inventory new Kia vehicles which they would not normally purchase and which they were not authorized to sell as new vehicles in order to further the scheme.

163.    The Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.  They knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

## THIRD CLAIM FOR RELIEF – FRAUD
### (Against the O'Brien Kia Dealerships, O'Brien, and Kuhn)

164.    KUS repeats and realleges the preceding paragraphs as if fully set forth herein.

165. The O'Brien Kia Dealerships engaged in a pattern and practice of submitting RDRs to Kia that falsely represented that they had made "retail" sales and which, under the Sales Policy, constituted requests for incentive payments to which they were not entitled

166. The RDRs were false when submitted and the O'Brien Kia Dealerships knew that they were false either at the time they were submitted or, in some cases, shortly thereafter, when they learned that no retail sale would occur. In the latter cases, rather than correct the inaccurate RDRs by notifying KUS, the O'Brien Kia Dealerships failed to notify KUS that the sales had been cancelled and kept the incentive payments to which they were not entitled.

167. The O'Brien Kia Dealerships knew and intended that KUS would rely on the false information in RDRs and make incentive payments to them based on the RDRs.

168. KUS justifiably relied on the O'Brien Kia Dealerships' representations and omissions of material fact to its detriment and made incentive payments to the O'Brien Kia Dealerships based on the false RDRs.

169. O'Brien and Kuhn aided and abetted the fraud by directing the O'Brien Kia Dealerships to submit RDRs before actual sales were made and by failing to unwind the false RDRs, despite their knowledge that the O'Brien Kia Dealerships had reported many more new Kia retail sales to KUS than they had actually made.

170. As a direct and proximate result of the misrepresentations and material omissions described herein, KUS has suffered damages in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF – NEGLIGENT MISREPRESENTATION**
**(Against the O'Brien Kia Dealerships, O'Brien, and Kuhn)**

171. KUS repeats and realleges the preceding paragraphs as if fully set forth herein.

41

172.    KUS incorporates by reference the allegations concerning the O'Brien Kia Dealerships' misrepresentations and omissions of material fact, their intent that KUS would rely on those misrepresentations and omissions of material fact, and KUS's justifiable reliance on those misrepresentations and omissions of material fact to its detriment.    Each of those misrepresentations and omissions of material fact were made intentionally for the purpose of defrauding KUS.    Alternatively and at a minimum, those misrepresentations and omissions of material fact were made negligently, and thus support a cause of action for negligent misrepresentation.

173.    O'Brien and Kuhn were, at a minimum, negligent in not correcting the false RDRs submitted to KUS because they failed to follow up on the email from a Group employee advising them that false sales reporting was occurring, and they knew or should have known, based on the sales and inventory reports available to them and which, on information and belief, they regularly reviewed, that the O'Brien Kia Dealerships had reported many more new Kia retail sales to KUS that they had actually made.

174.    The O'Brien Kia Dealerships' misrepresentations in the transactions listed on Exhibit A, and similar misrepresentations yet to be discovered with respect to other RDRs, and/or their failure to correct those misrepresentations, induced KUS to make the payments set forth on Exhibit A in connection with each of those RDRs as well as other payments yet to be discovered.

175.    As a direct and proximate result of the misrepresentations and material omissions described herein, KUS has been suffered damages in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF – CONVERSION
**(Against the O'Brien Kia Dealerships)**

176.    KUS repeats and realleges the preceding paragraphs as if fully set forth herein.

177.    The allegations concerning the submission of inaccurate RDRs and failure to affirmatively notify KUS that the reported retail sales never occurred, which resulted in KUS making incentive payments to the O'Brien Kia Dealerships to which they were not entitled, and the O'Brien Kia Dealerships' retention of those payments for their own benefit, are set forth in detail above and are incorporated by reference here. The O'Brien Kia Dealerships intentionally and wrongfully exercised acts of ownership, control and dominion over these incentive payments – money rightfully belonging to KUS – to which they had and have no right of possession.

## SIXTH CLAIM FOR RELIEF – CIVIL CONSPIRACY
### (Against all Defendants)

178.    KUS repeats and realleges the preceding paragraphs as if fully set forth herein.

179.    The Defendants knowingly and intentionally conspired to defraud KUS and to convert KUS's property.  The manner in which they combined and agreed to participate in a scheme designed to defraud KUS is described in detail above, and those allegations are incorporated by reference here.

180.    Each Defendant took at least one action in furtherance of the conspiracy, including but not limited to:  (1) each of the O'Brien Kia Dealerships submitted RDRs to KUS reflecting retail sales that did not occur; (2) each of the O'Brien Kia Dealerships retained incentive payments made by KUS to which they were not entitled; (3) each of the O'Brien Non-Kia Dealerships "purchased" new Kia vehicles in order to enable the O'Brien Kia Dealerships to obtain incentive payments to which they were not entitled; and (4) O'Brien and Kuhn directed the activities of the other defendants.

181.    As a direct and proximate result of this conspiracy, and the overt acts taken in furtherance of it, KUS has suffered damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF – BREACH OF CONTRACT
### (Against DMO Concord and DMO North Hampton)

182.    KUS repeats and realleges the preceding paragraphs as if fully set forth herein.

183.    At or about the time of its appointment as a Kia dealer, each of DMO Concord and DMO North Hampton entered into a Dealer Agreement with KUS.

184.    The Dealer Agreement sets out the rights and responsibilities of the parties with respect to, among other things, the sale and service of Kia vehicles.  The Dealer Agreement defines KUS as "COMPANY" and the dealer party as "DEALER."

185.    In Article IX.A.6. of Part 2 of the Dealer Agreement, "DEALER agrees to keep complete, accurate and current records regarding its sale, lease and servicing of Kia Products or any claims made upon or paid by COMPANY (whether warranty, policy or other claim) for at least five (5) years and in no event less than the retention period required by applicable law."

186.    Article IX.A.7 of Part 2 of the Dealer Agreement provides in pertinent part that "DEALER shall furnish to COMPANY at the times and in the form prescribed by COMPANY, complete, accurate and true statements of the financial condition and operating results of DEALER'S Kia dealership operations and such sales and other reports as COMPANY may from time to time require."

187.    Article XII.C.1 of Part 2 of the Dealer Agreement provides for termination of the agreement "[i]f DEALER, the Dealer Operator, or any Owner or officer of DEALER submits any false information to COMPANY or otherwise makes any material misrepresentation to COMPANY."

44

188.    Article XII.C.3(x) of Part 2 of the Dealer Agreement provides for termination of the agreement for "[f]ailure of DEALER to timely furnish accurate sales or financial information and related supporting data."

189.    The Dealer Agreement with each of DMO Concord and DMO North Hampton was and is a valid and binding contract.

190.    The Sales Policy described in paragraphs 64-73 above sets forth the terms and conditions under which KUS offered to pay incentives to its dealers and under which the dealers could accept the offered incentives.

191.    In addition, Article IX.A.7 of Part 2 of the Dealer Agreement obligated DMO Concord and DMO North Hampton to comply with the Sales Policy.

192.    KUS performed or substantially performed its obligations under the parties' contracts.

193.    By submitting false and/or inaccurate retail delivery reports, by misclassifying the applicable Sale Type, by failing to unwind RDRs when reported sales were not actually consummated, by failing to maintain required documentation, and by claiming and retaining sales incentive payments to which it was not entitled, all as more fully alleged above, DMO Concord and DMO North Hampton not only committed fraud but breached their respective contractual obligations under Articles IX.A.6, IX.A.7, XII.C.1, and XII C.3(x) of Part 2 of the Dealer Agreement and under Sections 1.3, 1.4, 1.5, 1.6, and 1.7 of the Sales Policy.

194.    By reason of the foregoing, KUS has suffered damages in an amount to be determined at trial.

45

**EIGHTH CLAIM FOR RELIEF – UNJUST ENRICHMENT**
**(Against DMO Concord, DMO North Hampton, and O'Brien)**

195.    KUS repeats and realleges the preceding paragraphs as if fully set forth herein.

196.    To the extent that DMO Concord and DMO North Hampton argue that they are not obligated to repay the amounts that KUS seeks to recover pursuant to their respective Dealer Agreements, KUS is alternatively entitled to recover those amounts through a claim for unjust enrichment.

197.    KUS conferred a benefit upon DMO Concord and DMO North Hampton in the form of incentive payments based on RDRs which did not entitle DMO Concord and DMO North Hampton to the incentive payments received.

198.    DMO Concord and DMO North Hampton and their owner, O'Brien, accepted the benefit of those incentive payments to the respective dealerships.

199.    The retention of the benefits of those payments by DMO Concord, DMO North Hampton, and O'Brien would be inequitable.

200.    By reason of the foregoing, KUS requests that DMO Concord, DMO North Hampton, and O'Brien be ordered to disgorge to KUS the benefits they received by reason of the unearned incentive payments, in amounts to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, KUS prays for relief and judgment as follows:

A.    Awarding KUS compensatory damages in an amount to be determined at trial together with pre- and post-judgment interest as provided by law;

B.    Awarding KUS statutory damages, including treble damages;

C.    Awarding KUS reasonable costs, including attorney's fees;

46

D.      Awarding KUS punitive damages against Defendants for their willful and fraudulent conduct; and

E.      Awarding such other relief, including equitable or injunctive relief, as is just and proper under the circumstances.

## Jury Trial Demanded

KUS demands trial by jury on all issues so triable.

Date:  May 8, 2024

/s/ *Kristin A. Connarn*
Kristin A. Connarn (N.H. Reg. No. 21011)
Kayla H. Ghantous *(Pro hac vice motion to be filed)*
Hogan Lovells US LLP
125 High St., Suite 2010
Boston, MA  02110
Tel:  (617) 371-1000
kristin.connarn@hoganlovells.com
kayla.ghantous@hoganlovells.com

John J. Sullivan
*(Pro hac vice motion to be filed)*
Hogan Lovells US LLP
390 Madison Avenue
New York, New York 10017
Tel:  (212) 918-3000
john.sullivan@hoganlovells.com

Jonathan R. Stulberg
(*Pro hac vice motion to be filed*)
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Tel: (310) 785-4600
Fax: (310) 785-4601
jonathan.stulberg@hoganlovells.com

*Attorneys for Plaintiff Kia America, Inc.*