UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Kia America, Inc.

v.                                    Civil No. 24-cv-128-LM-AJ
                                      Opinion No. 2025 DNH 046 P
DMO Auto Acquisitions, LLC et al.

**O R D E R**

Plaintiff Kia America, Inc. ("Kia") brings this action against a collection of current and former car dealerships and two of the dealerships' executives,[1] alleging civil claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 et seq., as well as tort and contract claims under state law. Kia alleges that defendants participated in a scheme to submit fraudulent sales documents to Kia to obtain incentive payments to which defendants were not entitled. Presently before the court are defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. nos. 19, 21. In doc. no. 21, all of the

---

[1] The defendants are: (1) DMO Auto Acquisitions, LLC f/d/b/a Dan O'Brien Kia of Concord ("DMO Concord"), a former Kia dealership; (2) DMO North Hampton, LLC f/d/b/a Dan O'Brien Kia of North Hampton ("DMO North Hampton"), a former Kia dealership; (3) DMO Norwood LLC f/d/b/a Dan O'Brien Kia Norwood ("DMO Norwood"), a former Kia Dealership (collectively with DMO Concord and DMO North Hampton, the "O'Brien Kia Dealerships"); (4) DMO Methuen LLC d/b/a Dan O'Brien Chrysler Dodge Jeep Ram ("DMO Methuen"), a Chrysler Dodge Jeep Ram dealership, (5) DMO Claremont, LLC f/d/b/a Dan O'Brien Subaru of Claremont ("DMO Claremont"), a former Subaru dealership; (6) DMO Hanover LLC f/d/b/a Dan O'Brien Infiniti of Hanover ("DMO Hanover"), a former Infiniti dealership (collectively with DMO Methuen and DMO Claremont, the "O'Brien Non-Kia Dealerships"); (7) Dan O'Brien, who is or was at all relevant times the CEO of all of these entities; and (8) Tom Kuhn, who is or was at all relevant times the COO of all these entities.

defendants seek dismissal on various grounds, including the statute of limitations. In doc. no. 19, one of the defendants (DMO Norwood) seeks dismissal of all claims against it on grounds of res judicata. Kia objects to both motions. Doc. nos. 25, 26. For the following reasons, doc. no. 21 is denied, but doc. no. 19 is granted.[2]

## STANDARD OF REVIEW

Under Rule 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 68, 71 (1st Cir. 2014) (quotation omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Analyzing plausibility is "a context-specific task" in which the court relies on its "judicial experience and common sense." Id. at 679.

In ruling upon a motion to dismiss brought under Rule 12(b)(6), the court is ordinarily limited to consideration of the facts alleged within the plaintiff's complaint. Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009). However, certain categories of documents may be considered in weighing a 12(b)(6) motion, such as "documents the authenticity of which [is] not disputed by the

---

[2] Although defendants requested a hearing, the court does not believe that a hearing would be of assistance. LR 7.1(d).

parties," "official public records," "documents central to [the plaintiff's] claim," and "documents sufficiently referred to in the complaint." Id. (quoting Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001)). In addition, when considering a motion to dismiss on grounds of res judicata, the court may consider the record in the original action. Medina-Padilla v. United States Aviation Underwriters, Inc., 815 F.3d 83, 85 (1st Cir. 2016). If the court considers documents outside this "narrow class," it must convert the motion into a motion for summary judgment using Rule 12(d)'s conversion procedure. Rivera, 575 F.3d at 15.

Finally, although a Rule 12(b)(6) analysis ordinarily tests the sufficiency of a plaintiff's claims and "a complaint need not anticipate or overcome affirmative defenses," Urena v. Travelers Cas. & Sur. Co. of Am., 714 F. Supp. 3d 31, 39 (D.N.H. 2024) (quoting Schmidt v. Skolas, 770 F.3d 241, 248 (3d Cir. 2014)), "it is sometimes permissible to grant a motion to dismiss based on an affirmative defense, such as the statute of limitations" or res judicata. Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005). This is permissible only when the plaintiff "'affirmatively plead[s] himself out of court' by alleging 'everything necessary to satisfy the affirmative defense.'" Urena, 714 F. Supp. 3d at 39 (quoting Hyson USA, Inc. v. Hyson 2U, Ltd., 821 F.3d 935, 939 (7th Cir. 2016)); accord Fujifilm N. Am. Corp. v. M&R Printing Equip., Inc., 565 F. Supp. 3d 222, 237 (D.N.H. 2021) ("A motion to dismiss based upon a statute-of-limitations defense may be granted 'when the pleader's allegations leave no doubt that an asserted claim is time-barred.'" (quoting Centro Medico del Turabo, 406 F.3d at 6)). Phrased

differently, a 12(b)(6) motion premised upon an affirmative defense must be denied when the complaint's allegations "leave open the possibility" that the defense may not apply. Urena, 714 F. Supp. 3d at 39.

## BACKGROUND[3]

### I.    The Parties

Kia is the exclusive United States distributor of Kia vehicles, parts, and accessories. It has approximately 788 authorized dealers in the United States, who collectively retail hundreds of thousands of new Kia vehicles each year.

O'Brien was the owner and operator of a collection of car dealerships between 2017 and 2023 marketed under the name "Dan O'Brien Auto Group" ("Auto Group"). The Auto Group was made up of the current and former dealerships named as defendants in this case, as well as an additional dealership that has not been

---

[3] Defendants attached a host of documents to their motions to dismiss. See doc. nos. 20-1 through 20-6; doc. nos. 22-1 through 22-14. Kia objects to this court's consideration of most of the defendants' materials, but also attached a plethora of extraneous materials to its objection to DMO Norwood's motion to dismiss. See doc. nos. 26-2 through 26-12. Some of the parties' attachments are publicly available documents from a prior legal proceeding in the District of Massachusetts. It is questionable whether the remaining attachments fall into any of the exceptions that permit the consideration of materials outside the complaint. The court will consider publicly available documents from the prior District of Massachusetts action in ruling upon defendants' motions but otherwise disregards the attachments to the parties' pleadings and relies upon the factual allegations within the complaint and the attachments thereto. See Douglas v. Hirshon, 63 F.4th 49, 57-58 (1st Cir. 2023) (explaining that "considering external documents is [not] mandatory" even if those documents fall into one of the "narrow exceptions" that allow a court to consider materials outside the complaint); Davis v. HSBC Bank Nev., N.A., 691 F.3d 1152, 1159 (9th Cir. 2012) ("[T]he district court may, but is not required to[,] incorporate documents by reference.").

named as a defendant. Kuhn was the COO of each of the seven dealerships in the Auto Group. The Dan O'Brien Auto Group is not a legal entity, however. It is simply a brand name.

O'Brien, Kuhn, and other executives directed and managed the affairs of all dealerships within the Auto Group from a central office in New Hampshire. Kia alleges that executives made financial decisions affecting Auto Group dealerships based upon what was best for the financial health of the Auto Group, as opposed to what was best for any individual dealership. In addition, O'Brien and Kuhn exercised centralized control over the vehicle inventory for each dealership; the on-site managers at individual dealerships did not.

II.    <u>Kia's Sales Incentives Program and Retail Delivery Reports</u>

In the auto industry, dealers report the sale of a new motor vehicle to their manufacturer or distributor through a "retail delivery report" or "RDR." Those within the auto industry often use the term "RDR" as a verb; to submit an RDR for a vehicle is to "RDR the vehicle." RDRs provide manufacturers or distributors with several pieces of information, including the sold vehicle's unique Vehicle Identification Number ("VIN"), the purchaser's name and contact information, and the "Sales Type," i.e., whether the vehicle was sold at retail to a consumer or by some other method to some other category of purchaser, such as a broker or wholesaler. Dealers submit RDRs using Kia's online portal, which transmits information in the RDR from wherever the dealer is located to Kia's servers in California. Kia uses information contained within RDRs for various purposes,

including to communicate with purchasers regarding safety recalls, to maintain accurate information regarding purchasers of its new vehicles as required by federal law, and, as relevant to this case, to make incentive payments to its dealers. But Kia does not independently verify information submitted in RDRs. It relies on its dealers to submit accurate information.

During the time that the O'Brien Kia Dealerships were in operation, Kia offered its dealers a sales incentive program under which the dealer could earn a monetary incentive for each vehicle it sold in a month if the dealership met its sales objective, or a percentage of its sales objective, for that month. By achieving 110% of its monthly sales objective, the dealership could earn an additional incentive payment for each vehicle it sold that month.

Kia's "Sales Policy" sets forth rules for the reporting of sales and RDRs, and defines the types of sales for which a dealer can claim and receive incentive payments. To be eligible for an incentive payment, the sale must be "at retail to an Eligible Customer of a new, unused Kia vehicle." Doc. no. 1 ¶ 67. An "Eligible Customer" is defined in pertinent part as a "bona fide purchaser/lessee for value (whether an individual, organization, or family . . . ) purchasing or leasing a Kia vehicle for personal or commercial use, who has no intent to resell the vehicle for profit, and who is not regularly engaged in the business of selling or leasing motor vehicles for profit." Id. ¶ 68. In addition, the customer must take delivery of the vehicle and "sign[ ] an enforceable sales or lease contract" for the vehicle within the month in which the incentive payment is claimed. Id. ¶ 67. The Sales Policy

expressly provides that sales to brokers and wholesalers are not eligible to receive incentive payments, and defines "Broker" to include "any person who purchases a Kia vehicle with the intent to resell it." Id. ¶ 69. The RDR associated with the sale for which the dealer seeks an incentive payment "must use the correct Sale Type" ,"must provide the Eligible Customer's correct full name [and contact information], and must otherwise provide complete and accurate information." Id. ¶ 70.

III.    The Alleged Scheme and its Discovery

Kia conducted an on-site vehicle inventory audit at two of the O'Brien Kia Dealerships (DMO Concord and DMO Norwood) over the course of three days in June 2021. The auditor found fifty-six vehicles on the dealerships' lots for which an O'Brien Kia Dealership had previously submitted an RDR claiming the vehicle had been sold at retail to a consumer. Kia asked DMO Concord, DMO Norwood, and the third O'Brien Kia Dealership (DMO North Hampton) for an explanation as to why vehicles that had been reported as sold were still available for sale on the dealerships' lots, but did not find their explanations satisfactory. Kia issued notices of termination to all three O'Brien Kia Dealerships on January 28, 2022, based on the discovery of these unsold vehicles.

DMO Concord and DMO North Hampton filed protests of the notices of termination to the New Hampshire Motor Vehicle Industry Board, and DMO Norwood challenged the notice of termination in Massachusetts state court. Kia thereafter removed the state court action to the United States District Court for the District of Massachusetts. Through materials obtained via discovery in these

7

actions as well as publicly available information concerning vehicle sales and registrations, Kia uncovered evidence that the O'Brien Kia Dealerships were submitting fraudulent RDRs over an extended period of time.

Based on its review of (1) RDRs submitted by the O'Brien Kia Dealerships, (2) the Dealerships' financial statements, and (3) the Dealerships' "Floorplan Statements" showing their inventory of new Kia vehicles, Kia discovered that, between January 2019 and June 2021, there were significant monthly discrepancies between the number of new Kia vehicles the O'Brien Kia Dealerships had in inventory and the number they would have had in inventory if their RDRs were accurate. In some months, the difference approached 350 vehicles. The discrepancy was greatly reduced in June 2021, when O'Brien and Kuhn received notice of Kia's intent to audit vehicle inventory at DMO Concord and DMO Norwood.

Ultimately, based on its review of materials produced in discovery as well as publicly available information, Kia discovered that, from January 2019 through December 2021, the O'Brien Kia Dealerships submitted at least 282 fraudulent RDRs for which Kia made incentive payments totaling nearly $600,000. The RDRs falsely represented one or more of the following: (1) a vehicle had been sold on a particular date, when it had not actually been sold on that date (or sold at all); (2) a vehicle had been sold to a particular retail consumer, when the vehicle had not actually been sold to that consumer; (3) a vehicle had been sold at retail, when it had actually been transferred to another Auto Group dealership and continued to be

offered for sale; or (4) a vehicle had been sold at retail to a consumer, when in reality it was sold to a wholesaler, broker, or similar entity.

IV.    <u>The Defendants' Roles</u>

Kia learned that O'Brien and Kuhn implemented a policy requiring the O'Brien Kia Dealerships to RDR vehicles as soon as the dealership received a deposit from a customer instead of waiting until the customer signed the sales or lease contract. O'Brien pressured the employees of these dealerships to RDR vehicles "early" or else suffer penalties in their compensation. If the sale ultimately fell through, the dealership would not reverse the RDR or return the incentive payment.

In many instances, an O'Brien Kia Dealership would sell vehicles to a wholesaler, broker, or other similar entity, but claim on the RDR associated with those vehicles that the vehicle had been sold to someone else. For example, in 2021, DMO Concord submitted RDRs for nine vehicles that it sold to a wholesaler. But the RDRs for those vehicles claimed the vehicles had been sold to retail consumers. All of those RDRs contained fictitious email addresses. And all of the "consumers" listed on the RDRs were, in fact, employees of the Dan O'Brien Auto Group. Similarly, at the end of December 2021 (when the time to meet the monthly sales quota necessary to trigger incentive payments was approaching an end), DMO Concord submitted RDRs for seven vehicles that it sold to Enterprise Car Rental. But the RDRs mischaracterized the sales as retail sales and listed the purchasers as Auto

Group employees, not anyone with Enterprise. In one instance, the name of the purchaser on an RDR was "Abraham Lincoln."

The O'Brien Non-Kia Dealerships were also part of the alleged scheme to defraud Kia. They were used as supposed retail purchasers of new Kia vehicles from the O'Brien Kia Dealerships to enable the latter dealerships to claim incentive payments. For example, DMO Claremont "purchased" at least fifty-four new Kia vehicles from the O'Brien Kia Dealerships between January 2019 and December 2021. And on November 30, 2020 (the last day of the sales month), DMO Norwood submitted fifteen RDRs for cars it claimed had been sold at retail, when in reality eight of the vehicles were transferred to DMO Claremont, and the other seven were transferred to DMO Hanover. When these intra-Group transfers occurred, the transferring dealership typically did not transfer title to the purchasing dealership, and the vehicle was not registered with the applicable state motor vehicle department. The vehicles that were the subject of these transfers continued to be offered for sale, usually as "new," as though they had not previously been sold. But the O'Brien Non-Kia Dealership to which the vehicle had been transferred could not lawfully sell the vehicle as "new," because those dealerships were not franchised Kia dealers. On certain occasions, the O'Brien Non-Kia Dealership would transfer the vehicle back to the relevant O'Brien Kia Dealership to complete the sale of the vehicle as "new."

Kia also uncovered evidence of steps the defendants took to avoid detection. After receiving notice of Kia's intent to audit DMO Concord and DMO Norwood in

10

June of 2021, O'Brien ordered the wholesale of more than a dozen vehicles that had previously been "sold" by DMO Concord to other Auto Group dealerships. O'Brien and Kuhn also directed the transfer of numerous vehicles on the lot at DMO Concord and DMO Norwood, which had previously been reported to Kia as sold at retail, to other Auto Group dealerships.

V.    The Massachusetts Action[4]

As noted, Kia removed DMO Norwood's action challenging the notice of termination from a Massachusetts state court to the United States District Court for the District of Massachusetts on March 29, 2022. See DMO Norwood LLC v. Kia Am., Inc., No. 22-cv-10470-ADB (D. Mass. Mar. 29, 2022). On June 15, 2022, the District of Massachusetts approved a pretrial scheduling order setting dates for discovery, dispositive motions, and other pretrial matters. A bench trial had previously been set for January 9, 2023.

In its original answer in the Massachusetts action, Kia did not assert any counterclaims. On September 19, 2022 (after it obtained the previously discussed evidence of the alleged fraudulent RDR scheme), Kia filed a motion to amend its answer to add counterclaims for civil RICO, RICO conspiracy, fraud, negligent misrepresentation, conversion, civil conspiracy, and breach of contract. Kia also

_____

[4] The following information is gleaned from the complaint and from publicly available documents filed by the parties or issued by the court in the civil action between DMO Norwood and Kia in the District of Massachusetts. The court may consider these documents without converting defendants' motions into motions for summary judgment. See Medina-Padilla, 815 F.3d at 85; Oren v. Verizon Commc'ns, 224 F.R.D. 527, 529 (D. Me. 2004) ("[T]he Court may properly consider proceedings from prior litigation when acting on a Motion to Dismiss . . . .").

sought to add O'Brien and the other two O'Brien Kia Dealerships to the case as counterclaim-defendants.

Ultimately, the District of Massachusetts granted the motion to amend as to the breach-of-contract counterclaim against DMO Norwood, but denied it as to the other proposed counterclaims and the proposed counterclaim-defendants. See DMO Norwood LLC v. Kia Am., Inc., No. 22-cv-10470-ADB, 2023 WL 2021321, at *4-5 (D. Mass. Feb. 15, 2023). The court reasoned that DMO Norwood's claims against Kia were "narrowly focused on Kia's audit of DMO Norwood and its subsequent effort to terminate the parties' Dealer Agreement," and Kia's proposed counterclaims "would significantly expand the case and trial, putting at issue a broad alleged pattern and practice of fraudulent activity by numerous entities and entirely new theories of liability, including complex RICO and other conspiracy claims." Id. at *4. The court found that such an expansion of the case's scope mere months before the original bench trial date would unfairly prejudice DMO Norwood. Id. However, the court allowed Kia to amend its answer to assert its breach-of-contract counterclaim against DMO Norwood because whether DMO Norwood's submission of allegedly fraudulent RDRs violated the parties' Dealer Agreement was "squarely at issue" in DMO Norwood's claims against Kia. Id.

Following the court's order, Kia filed its amended answer containing its breach-of-contract counterclaim, and the parties proceeded with discovery and motions practice. On December 11, 2023, the parties filed a joint "Stipulation of Dismissal With Prejudice," in which the parties stipulated, "in consideration of a

negotiated settlement agreement executed by them," to the dismissal with prejudice of all DMO Norwood's claims and Kia's breach-of-contract counterclaim. <u>DMO Norwood LLC</u>, No. 22-cv-10470-ADB (doc. no. 138).

VI.    <u>The Instant Action</u>

Kia filed the instant complaint on May 8, 2024. The complaint includes the following claims:

- Count I: Civil RICO in violation of 18 U.S.C. § 1962(c) against all defendants;

- Count II: RICO conspiracy in violation of 18 U.S.C. § 1962(d) against all defendants;

- Count III: Fraud against the O'Brien Kia Dealerships, O'Brien, and Kuhn;

- Count IV: Negligent Misrepresentation against the O'Brien Kia Dealerships, O'Brien, and Kuhn;

- Count V: Conversion against the O'Brien Kia Dealerships;

- Count VI: Civil conspiracy against all defendants;

- Count VII: Breach of contract against DMO Concord and DMO North Hampton; and

- Count VIII: Unjust enrichment against DMO Concord, DMO North Hampton, and O'Brien.

Kia seeks compensatory damages, treble damages for its RICO claims pursuant to 18 U.S.C. § 1964(c), punitive damages, attorney fees and costs, and "such other relief, including equitable or injunctive relief, as is just and proper under the circumstances." Doc. no. 1 at 47.

**DISCUSSION**

Defendants move to dismiss on various grounds. First, defendants argue that all of Kia's claims are untimely. Second, they argue that Kia's RICO claims should be dismissed for failure to state a claim.[5] Third, defendants argue that this court must abstain from deciding Kia's claims under Burford v. Sun Oil Co., 319 U.S. 315 (1943). Fourth, DMO Concord and DMO North Hampton argue that Kia's claims against them must be dismissed for failure to exhaust administrative remedies. Fifth and finally, DMO Norwood argues that Kia's claims against it are barred by res judicata. The court will consider each argument in turn.

I.    The Factual Allegations in the Complaint Do Not Establish Beyond All Doubt that Kia's Claims are Time-Barred

To state a civil RICO claim under § 1962(c), the plaintiff must plausibly allege "(1) conduct (2) of an enterprise, (3) through a pattern (4) of racketeering activity." Soto-Negrón v. Taber Partners I, 339 F.3d 35, 38 (1st Cir. 2003) (quoting N. Bridge Assocs., Inc. v. Boldt, 274 F.3d 38, 42 (1st Cir. 2001)). And under § 1962(d), it is "unlawful for any person to conspire to violate" subsection (c). 18 U.S.C. § 1962(d). Section 1964(c) establishes a cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." Id. § 1964(c).

Civil RICO claims are subject to a four-year statute of limitations. Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987). Accrual is

---

[5] Defendants do not argue that Kia's state law claims should be dismissed for failure to state a claim.

governed by the discovery rule; the limitations period begins to run when the plaintiff discovers or should have discovered his injury. Lares Grp., II v. Tobin, 221 F.3d 41, 44 (1st Cir. 2000); accord In re Celexa & Lexapro Mktg. & Sales Pracs. Litig., 915 F.3d 1, 14 (1st Cir. 2019). A plaintiff is charged with knowledge of his injury when "sufficient facts [are] available to provoke a reasonable person in the plaintiff's circumstances to inquire or investigate further." In re Celexa, 915 F.3d at 15 (quoting McIntyre v. United States, 367 F.3d 38, 52 (1st Cir. 2004)). "Once a duty to inquire is established, the plaintiff is charged with the knowledge of what he or she would have uncovered through a reasonably diligent investigation." Id. (quoting McIntyre, 367 F.3d at 52).

With respect to Kia's state law claims, the parties agree that the applicable limitations period is set forth in RSA 508:4. That statute establishes a limitations period of three years. RSA 508:4. The limitations period begins running at the time of the "act or omission complained of," unless the plaintiff could not have reasonably discovered that he was injured by the challenged act or omission at the time of its occurrence. Id.; accord Fujifilm, 565 F. Supp. 3d at 237. In that case, the discovery rule applies: the limitations period begins to run when the plaintiff "knows, or reasonably should have known," that he was injured by the defendant's act or omission. Fujifilm, 565 F. Supp. 3d at 237 (quoting Archdiocese of San Salvador v. FM Int'l., LLC, No. 05-CV-237-JD, 2006 WL 437493, at *4 (D.N.H. Feb. 23, 2006)).

Here, defendants argue that Kia's claims are time-barred beyond all doubt because the information required for Kia to discover its alleged injuries was

available through the exercise of reasonable diligence as early as January 2019. According to defendants, Kia could have discovered the significant monthly discrepancies between the O'Brien Kia Dealerships' actual vehicle inventory and the inventory those dealerships would have had if their RDRs were accurate by simply comparing the dealerships' RDRs with their financial statements, both of which Kia had in its possession. Kia could have learned of this discrepancy as of January 2019 and could have thereafter elected to audit the O'Brien Kia Dealerships, which, defendants say, would have revealed Kia's alleged injuries.

Construing all facts and drawing all reasonable inferences in Kia's favor, the court is not persuaded that Kia's claims are untimely beyond all doubt. Under federal and New Hampshire law alike, "[w]hether a plaintiff knew or should have known of an injury so as to trigger the running of a statute of limitations is, with rare exception, a jury issue." In re Lupron Mktg. & Sales Pracs. Litig., 295 F. Supp. 2d 148, 183 (D. Mass. 2003); see Oullette v. Beaupre, 977 F.3d 127, 143 & n.11 (1st Cir. 2020); Troy v. Bishop Guertin High Sch., 176 N.H. 131, 137 (2023); see also Humana, Inc. v. Biogen, Inc., 666 F. Supp. 3d 135, 145-46 (D. Mass. 2023) (declining to dismiss civil RICO claim on statute-of-limitations grounds given the "fact-intensive question" of when plaintiff was on inquiry notice). Kia filed this action in May 2024 after first learning in June 2021 of its injuries following its audits of DMO Concord and DMO Norwood. If the limitations periods began running in June 2021, Kia's action is timely.

As for whether Kia should have known of its injury before June 2021, Kia alleges that it has nearly 800 dealers throughout the country who collectively retail hundreds of thousands of new Kia vehicles each year. Each such sale generates an RDR. Kia alleges that it is not feasible for Kia to confirm the accuracy of each of the hundreds of thousands of RDRs it receives from its dealers each year, as doing so would require it to audit each of its nearly eight hundred dealerships each month or individually contact each purchaser listed on each RDR to confirm the information contained therein. Construing the facts in Kia's favor, the court cannot conclude as a matter of law at this early stage that Kia could have discovered its alleged injury prior to June 2021 through the exercise of reasonable diligence.

Moreover, the allegations in Kia's complaint "leave open the possibility that an exception to the statute of limitations could apply." Urena, 714 F. Supp. 3d at 39-40. Kia has alleged facts from which the court can draw the reasonable inference that O'Brien and Kuhn took steps to conceal their alleged scheme, including by transferring previously RDR'd vehicles from O'Brien Kia Dealerships to other dealerships shortly before a scheduled audit, and by selling scores of previously RDR'd vehicles at wholesale just before an audit. Both federal and New Hampshire law recognize that a statute of limitations may be tolled pursuant to the doctrine of fraudulent concealment. See Álvarez-Maurás v. Banco Popular of P.R., 919 F.3d 617, 626 (1st Cir. 2019); Beane v. Dana S. Beane & Co., P.C., 160 N.H. 708, 714 (2010). Generally speaking, fraudulent concealment pauses the progression of a limitations period "during such time that the perpetrator purposefully and

successfully conceals his or her misconduct from its victim." Álvarez-Maurás, 919 F.3d at 626. The allegations in Kia's complaint do not foreclose the possibility that, after discovery and with the development of additional evidence, a reasonable jury could conclude that defendants took steps to conceal their alleged misconduct from Kia.

For these reasons and construing all facts in Kia's favor at this early stage, the court concludes that the allegations in Kia's complaint fail to establish that its claims are time-barred beyond all doubt.

## II.    The Complaint Plausibly States Civil RICO Claims

Defendants contend that Kia's civil RICO claims must be dismissed for several reasons. First, they argue that Kia has failed to plausibly allege a RICO "person" separate from the alleged RICO "enterprise." Second, they argue that Kia fails to plausibly allege an "association-in-fact" enterprise. Third, defendants contend that Kia failed to plead a pattern of racketeering activity with sufficient particularity. And finally, defendants assert that Kia has not plausibly alleged a "pattern" of racketeering activity. The court will address each argument in turn.[6]

---

[6] In their reply, defendants argue that Kia's RICO claims fail as a matter of law for additional reasons. "Arguments raised for the first time in a reply brief, however, are waived." EnergyNorth Nat. Gas, Inc. v. Century Indem. Co., Civ. No. 99-cv-049-JD, 2007 WL 776124, at *1 n.4 (D.N.H. Mar. 15, 2007). Defendants' new arguments are not responsive to the arguments raised in Kia's objection, and defendants identify no reason they could not have raised their new arguments in their motion to dismiss. The court therefore declines to consider them.

A.      Kia Has Plausibly Alleged a RICO "Person" Distinct From a RICO
        "Enterprise"

RICO makes it unlawful "for any person employed by or associated with any

enterprise" to "conduct . . . such enterprise's affairs through a pattern of

racketeering activity." 18 U.S.C. § 1962(c). "[T]o establish liability under § 1962(c)

one must allege and prove the existence of two distinct entities: (1) a 'person'; and

(2) an 'enterprise' that is not simply the same 'person' referred to by a different

name." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). "This is

because Section 1962(c) seeks to punish the culpable person who misuses the

enterprise." Deane v. Weyerhaeuser Mortg. Co., 967 F. Supp. 30, 33 (D. Mass.

1997); accord Bessette v. Avco Fin. Servs., Inc., 279 B.R. 442, 453 (D.R.I. 2002)

("The enterprise, the criminal tool, is not liable and cannot be a defendant in a

RICO action."). Defendants contend that Kia fails to allege any person distinct from

an enterprise because Kia alleges that each defendant is a RICO person, and

further alleges that defendants together form the relevant RICO enterprise.

Defendants are incorrect. Distinctiveness under RICO requires only that the

person(s) and the enterprise be distinct entities. Kushner, 533 U.S. 163; see also

Lupron, 295 F. Supp. 2d at 173 (explaining that distinctiveness requirement is

violated when "only one entity was said to have filled the dual function of person

and enterprise," and not when "the enterprise is said to be the collective whole of its

constituent parts"). Each of the members of an organization may constitute a RICO

person and may together form an organization, but that does not mean that each

19

member is itself the organization.[7] See 18 U.S.C. § 1961(4) (defining "enterprise" to include "any union or group of individuals associated in fact although not a legal entity"); United States v. Turkette, 452 U.S. 576, 583 (1981) (construing RICO's definition of "enterprise" to include "a group of persons associated together for a common purpose of engaging in a course of conduct"). "[W]hile one basketball player does not constitute a team, an association of five players does, without each losing his identity as a . . . person" distinct from the team of which he is a part. Lupron, 295 F. Supp. 2d at 173.

Construing the complaint's factual allegations and drawing all reasonable inferences in Kia's favor, Kia alleges that the defendants, while each a RICO "person," together formed a RICO "enterprise" that engaged in a scheme to defraud Kia by submitting fraudulent RDRs over a prolonged period of time. No more is needed to plausibly allege a distinct RICO enterprise.

B.    Kia Has Plausibly Alleged an "Association-in-Fact" Enterprise

As noted, a RICO "enterprise" is defined to "include[ ] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

---

[7] Distinctiveness issues are more likely to appear where the relevant RICO enterprise is a legal entity capable of being sued, such as a corporation. See Rodriguez v. Banco Central, 777 F. Supp. 1043, 1053-54 (D.P.R. 1991), aff'd, 990 F.2d 7 (1st Cir. 1993); Gregory P. Joseph, Civil RICO: A Definitive Guide 90 (4th ed. 2015). In those circumstances, the distinctiveness requirement is violated when the plaintiff sues the corporation while simultaneously alleging that the corporation is the relevant RICO enterprise. See United States v. Goldin Indus., Inc., 219 F.3d 1271, 1275 (11th Cir. 2000).

The complaint alleges that the defendants form an "association-in-fact" enterprise under this definition. Doc. no. 1 ¶ 129. To be an association-in-fact, the enterprise must have: (1) a purpose; (2) "relationships among those associated with the enterprise"; and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946 (2009). Defendants do not challenge the complaint's sufficiency as to the purpose prong or the longevity prong. Defendants do challenge the sufficiency of Kia's allegations as to the relationships prong, asserting that the complaint's factual allegations sketch out no more than a "rimless hub-and-spoke" structure.

A rimless hub-and-spoke structure exists when "one entity (the hub) transacts similarly with several other entities (the spokes)" but there is no "connection among the enterprises' respective spokes." Sheet Metal Workers Local No. 20 Welfare & Benefit Fund v. CVS Pharm., Inc., 305 F. Supp. 3d 337, 346-47 (D.R.I. 2018). For example, a rimless hub-and-spoke model may exist where a pharmaceutical company works with numerous physicians to prescribe the company's drugs, but the individual physicians have no involvement with each other. E.g., In re Pharm. Indus. Average Wholesale Price Litig., 263 F. Supp. 2d 182-84 (D. Mass. 2003). Although it does not appear that the First Circuit has squarely addressed the issue, most courts have held that rimless hub-and-spoke enterprises fail to satisfy Boyle's requirement that there be relationships among the enterprise's associates. Sheet Metal Workers, 305 F. Supp. 3d at 346-47; see, e.g., In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 374-75 (3d Cir. 2010); McDonough

v. First Am. Title Ins. Co., No. 10-cv-106-SM, 2011 WL 285685, at *5-6 (D.N.H. Jan. 28, 2011).

Assuming the First Circuit would join those courts, the complaint's factual allegations allow the court to reasonably infer that the alleged enterprise was more than a rimless hub-and-spoke structure. Kia alleges that O'Brien and Kuhn exercised centralized control over all dealerships within the Auto Group, making financial decisions for individual dealerships based on the overall financial stability of the Auto Group and not based on the individual dealerships' needs. See Cedar Swamp Holdings, Inc. v. Zaman, 487 F. Supp. 2d 444, 451 (S.D.N.Y. 2007) (explaining that a RICO enterprise may exist where the defendants "operate[ ] symbiotically"). Kia further alleges that the O'Brien Kia Dealerships, at O'Brien and Kuhn's direction, "sold" vehicles to O'Brien Non-Kia Dealerships to generate RDRs and obtain incentive payments. In many cases, the vehicle would then be transferred back to the O'Brien Kia Dealership to complete a sale of the vehicle as "new." The complaint also alleges that the Kia Dealerships transferred inventory to the Non-Kia Dealerships to prevent Kia from discovering that vehicles previously RDR'd as sold to consumers remained available for sale. These allegations are sufficient to satisfy Boyle's relationships prong at this early stage. See Sheet Metal Workers, 305 F. Supp. 3d at 348-49 (finding complaint sufficient where plaintiff alleged that the defendants "communicated with each other and with CVS in order to orchestrate the alleged fraud"). This is especially true considering Boyle's recognition that "the very concept of an association in fact is expansive," as well as

its admonishment that RICO must be "liberally construed to effectuate its remedial purposes." Boyle, 556 U.S. at 944 (quotation omitted).

For these reasons, the court rejects defendants' argument that Kia has failed to plausibly allege an association-in-fact enterprise.

C.    Kia Has Pled a Pattern of Racketeering Activity With Sufficient Particularity

To state a claim for violation of § 1962(c) (or a claim for conspiracy to violate that section under § 1962(d)), the plaintiff must plausibly allege "a pattern of racketeering activity." 18 U.S.C. § 1962(c); Efron v. UNS Fin. Servs. Inc. of P.R., 96 F.4th 430, 437 (1st Cir. 2024). Racketeering activity is defined to include a host of criminal conduct, including mail and wire fraud. 18 U.S.C. § 1961(1)(B). When the plaintiff alleges that the relevant racketeering activity is mail or wire fraud, he must satisfy Rule 9(b)'s heightened particularity requirements. Ahmed v. Rosenblatt, 118 F.3d 886, 889 (1st Cir. 1997).

Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The First Circuit has construed Rule 9(b) to require that "the complaint . . . state the time, place[,] and content of the alleged mail and wire communications perpetrating that fraud." Efron, 96 F.4th at 437 (quoting Douglas v. Hirshon, 63 F.4th 49, 55 n.7 (1st Cir. 2023)). The Circuit has also held that one of the primary purposes of this particularity requirement is to give defendants adequate notice of the conduct the plaintiff alleges to be fraudulent. New England Data Servs., Inc. v. Becher, 829 F.2d 286, 289 (1st Cir. 1987); see also 5A A. Benjamin Spencer, Federal

23

Practice & Procedure § 1298 (4th ed.) (stating that the sufficiency of a pleading under 9(b) is often controlled by "the determination of how much detail is necessary to give adequate notice to an adverse party and to enable that party to prepare a responsive pleading").

Here, defendants allege that Kia's allegations of fraud fail to meet Rule 9(b)'s particularity requirements. Defendants are incorrect.

Defendants give short shrift to the appendix to Kia's complaint. Doc. no. 1-1. That appendix contains a chart providing information regarding each of the 282 RDRs Kia thus far alleges were fraudulently transmitted via the wires. For each RDR, Kia lists (1) the vehicle's VIN, (2) the date the RDR was submitted; (3) the false information contained within the RDR (i.e., the RDR falsely states the date of the vehicle's sale, to whom the vehicle was sold, or the category of the sale); and (4) the amount Kia paid as a result of the RDR's submission. Elsewhere, the complaint alleges that RDRs were submitted from the O'Brien Kia Dealerships to Kia's headquarters in California via Kia's online portal. These allegations are sufficient to put defendants on notice of the "time, place[,] and content" of their alleged fraud. Efron, 96 F.4th at 437 (quotation omitted).

Defendants nevertheless contend that Kia's allegations fail Rule 9(b) because the complaint does not provide specific information as to why each RDR was fraudulent, such as, for example, the date the sale actually occurred if that date differed from what was listed on the RDR. The court is not persuaded that the complaint must drill down to such granular levels to satisfy Rule 9(b). Rule 9(b)

must be "harmonize[d] . . . with Rule 8, which requires that averments in pleadings be concise and direct." McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226, 228 (1st Cir. 1980), superseded by statute on other grounds as recognized in N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 16 (1st Cir. 2009); accord, e.g., Saltire Indus. Inc. v. Waller, Lansden, Dortch & Davis, PLLC, 491 F.3d 522, 526 (6th Cir. 2007) ("Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony." (quoting Sanderson v. HCA-The Healthcare Co., 447 F.3d 873, 876 (6th Cir. 2006))). The complaint contains an efficient and effective summary of 282 allegedly fraudulent RDRs, providing defendants with "the who, what, where, and when" of the allegedly fraudulent conduct. Dumont v. Reily Foods Co., 934 F.3d 35, 38 (1st Cir. 2019) (quoting Kaufman v. CVS Caremark Corp., 836 F.3d 88, 91 (1st Cir. 2016)).

Defendants do not allege that they require further specificity to respond to Kia's allegations. See id. at 39 (complaint satisfied Rule 9(b) where defendants did "not suggest that they required any further particularity to respond to the complaint"). Indeed, defendants are in possession of much or all of the information they complain is missing from the complaint (such as the names of the customers each vehicle was actually sold to), and the complaint provides defendants with sufficient detail to enable them to locate said information. See Rothman v. Equinox Holdings, Inc., No. 2:20-cv-09760-CAS-MRWx, 2021 WL 1627490, at *5 (C.D. Cal. Apr. 27, 2021) (explaining that allegations of fraud need only be "specific enough to

give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong" (quoting United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1180 (9th Cir. 2016))).

For these reasons, Kia has pled a pattern of racketeering activity with sufficient particularity.

### D.    Kia Has Plausibly Alleged a "Pattern" of Racketeering Activity

For racketeering activity to constitute a "pattern" for RICO purposes, the plaintiff must show that the racketeering activities are (1) related and (2) "that they amount to or pose a threat of continued criminal activity." Giuliano v. Fulton, 399 F.3d 381, 386 (1st Cir. 2005) (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)). Defendants challenge the sufficiency of Kia's allegations to the relatedness element, but not the continuity element.

"The relatedness test is not a cumbersome one for a RICO plaintiff." Feinstein v. Resolution Tr. Corp., 942 F.2d 34, 44 (1st Cir. 1991), abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997). "A showing that predicate acts 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events' is essentially all that is needed." Id. (quoting H.J., 492 U.S. at 240). "A fact-specific allegation of a single common scheme can be used to satisfy the relatedness requirement." Id.

Kia has alleged facts from which the court can plausibly infer that the alleged instances of fraud constituting the RICO pattern satisfy this test. Kia alleges that defendants engaged in a single common scheme to submit fraudulent RDRs with a purpose to obtain incentive payments to which they were not entitled. The alleged predicate acts all had the same victim (Kia) and the same result (monetary payment). The manner in which each RDR was allegedly fraudulent was also stable and consistent—each RDR untruthfully claimed that (1) a sale was made on a particular date; (2) a sale was made to a particular customer; or (3) a sale was made at retail. These allegations clear the low bar of relatedness. See, e.g., Fleet Credit Corp. v. Sion, 893 F.2d 441, 445 (1st Cir. 1990) (holding that fraudulent mailings were "clearly related because they were all part of the same fraudulent scheme").

Undeterred, defendants allege that the complaint must also plausibly allege "vertical relatedness." While acknowledging that the First Circuit has not adopted a "vertical relatedness" requirement, defendants contend that other courts would require Kia's complaint to plausibly allege "that the defendant[s] [were] enabled to commit the offense solely because of [their] position[s] in the enterprise or [their] involvement in or control over the enterprise's affairs, or because the offense related to the activities of the enterprise." United States v. Burden, 600 F.3d 204, 216 (2d Cir. 2010).

Assuming arguendo that such a requirement applies in this case, Kia's allegations satisfy it. The Second Circuit holds that vertical relatedness is "satisfied by linking each predicate act to the enterprise." Id. The alleged enterprise here is an

association-in-fact with the common purpose of engaging in a scheme to defraud Kia by submitting fraudulent RDRs. The predicate acts—the submission of fraudulent RDRs—are linked to that enterprise. Indeed, the complaint alleges that submitting fraudulent RDRs was the very reason for the enterprise's existence. See doc. no. 1 ¶ 132.

For these reasons, Kia has plausibly alleged a "pattern" of racketeering activity.

III.    _Burford_ Abstention Is Not Warranted

As previously discussed, Kia sent DMO Concord and DMO North Hampton notices of termination in January 2022, and those dealerships subsequently filed protests of those notices before the New Hampshire Motor Vehicle Industry Board ("the Board"). Defendants contend that this court must abstain under Burford from deciding all of Kia's claims in this case because some of those claims implicate DMO Concord and DMO North Hampton's claims before the Board.

Abstention is disfavored. See Chico Serv. Station, Inc. v. Sol P.R. Ltd., 633 F.3d 20, 28-29 (1st Cir. 2011) (noting abstention's "uneasy position in the jurisprudence of federal court jurisdiction"). "The baseline rule . . . is that 'federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress.'" Forty Six Hundred LLC v. Cadence Educ., LLC, 15 F.4th 70, 74 (1st Cir. 2021) (quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996)). That said, the Supreme Court has carved out exceptions to this "virtually unflagging obligation" to exercise jurisdiction where certain categories of "exceptional

circumstances" exist. Colo. River Water Conservation Dist. v. United States, 424

U.S. 800, 813-817 (1976) (quotation omitted).

Burford is one such category. Abstention is proper under Burford when the

state has committed important matters of state law or policy in the first instance to

resolution through a complex regulatory scheme, and the exercise of federal

jurisdiction would risk the creation of "a parallel, additional, federal regulatory

review mechanism, the existence of which would increase the difficulty of

administering the state regulatory scheme." Bath Mem'l Hosp. v. Me. Health Care

Fin. Comm'n, 853 F.2d 1007, 1013 (1st Cir. 1988) (Breyer, J.) (internal quotation

marks omitted); accord, e.g., Pub. Serv. Co. of N.H. v. Patch, 167 F.3d 15, 24 (1st

Cir. 1998) ("The fundamental concern in Burford is to prevent federal courts from

bypassing a state administrative scheme and resolving issues of state law and

policy that are committed in the first instance to expert administrative resolution.");

New Orleans Pub. Serv. Inc. v. Council of New Orleans (NOPSI), 491 U.S. 350, 362

(1989) (explaining that "Burford is concerned with protecting complex state

administrative processes from undue federal interference"). Burford abstention is

rarely justified; it is not enough that the federal case "implicates 'important state

regulatory policies,' or that [the] 'federal action may impair operation of a state

administrative scheme or overturn state policy.'" Forty Six Hundred, 15 F.4th at 75

(citation omitted) (quoting Chico Serv. Station, 633 F.3d at 30); accord NOPSI, 491

U.S. at 362 (explaining that Burford "does not require abstention whenever there

exists [a complex state administrative process], or even in all cases where there is a

'potential for conflict' with state regulatory law or policy" (quoting Colo. River, 424 U.S. at 815-16)). Instead, <u>Burford</u> abstention is appropriate "only in 'unusual circumstances,' where the federal court risks usurping the state's role as the 'regulatory decision-making center.'" Forty Six Hundred, 15 F.4th at 75 (quoting Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 474 (1st Cir. 2009)).

Defendants assert that New Hampshire has committed resolution of disputes between motor vehicle manufacturers and their dealers to the Board pursuant to RSA chapter 357-C. Specifically, they point to RSA 357-C:12, which provides that the Board has certain "exclusive powers," including the power to entertain "a written protest . . . complaining of conduct governed by and violative of this chapter." RSA 357-C:12, II.

Defendants are incorrect. They ignore language in the very statute they rely upon highlighting that the Board's power to hear written protests does not bar "civil actions filed in superior court pursuant to paragraph IX of this statute." <u>Id.</u> Paragraph IX provides that "any person whose business or property is injured by a violation of this chapter . . . may bring a civil action in the superior court to recover the actual damages sustained by such person." RSA 357-C:12, IX; <u>see also</u> Fog Motorsports # 3, Inc. v. Arctic Cat Sales, Inc., 159 N.H. 266, 268-69 (2009) (holding that chapter 357-C's forum-selection requirements "require that a New Hampshire forum, including the superior court, entertain any action brought under" chapter 357-C). Indeed, this court has entertained claims for violations of chapter 357-C over abstention challenges. <u>See, e.g.,</u> Ford Motor Co. v. Meredith Motor Co., Inc.,

Civ. No. 99-456-B, 2000 WL 1513702, at *1-3 (D.N.H. Aug. 24, 2000) (declining to dismiss claim under RSA chapter 357-C pursuant to <u>Colorado River</u> abstention where parallel proceeding before the Board existed). Thus, New Hampshire has not committed all matters within the purview of chapter 357-C to resolution through an administrative scheme.

But even if it had, proceedings before the Board are not the sort of complex administrative scheme to which <u>Burford</u> abstention applies. <u>See</u> <u>Cnty. of Suffolk v. Long Island Lighting Co.</u>, 907 F.2d 1295, 1309 (2d Cir. 1990) (cited with approval in <u>Forty Six Hundred</u>, 15 F.4th at 76) (explaining that an "intricate state administrative scheme" is the "sine qua non" of <u>Burford</u> abstention). RSA 357-C:12 makes clear that Board proceedings are, for the most part, ordinary adjudicative proceedings before an administrative body. Parties to Board proceedings involving alleged violations of certain provisions of chapter 357-C may invoke the same discovery procedures as are available in New Hampshire Superior Court. RSA 357-C:12, III. There are provisions for mandatory settlement conferences "no later than 45 days after the filing of the protest," RSA 357-C:12, IV, as well as for enforcement of a party's discovery obligations, RSA 357-C:12, V, and for judicial review and appeal of Board decisions, RSA 357-C:12, VII. Board proceedings do not present the kind of complex regulatory regime that may trigger <u>Burford</u> abstention. <u>See</u> <u>Forty Six Hundred</u>, 15 F.4th at 76 (explaining that "rules of procedure designed to expedite summary eviction proceedings" in Massachusetts courts were not "the sort of complex administrative scheme at issue in <u>Burford</u>" (quotation omitted)).

In addition, the First Circuit recently reiterated that <u>Burford</u> abstention is appropriate only where a plaintiff "seek[s] individualized review of fact- (or cost-) specific regulatory decision making." <u>R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC</u>, 92 F.4th 330, 347 (1st Cir. 2024) (quoting <u>Bath Mem'l</u>, 853 F.2d at 1014). Here, Kia does not seek review of fact-specific regulatory decision making. The facts of <u>Burford</u> itself provide a helpful contrast. In <u>Burford</u>, a plaintiff proceeding under diversity jurisdiction asked a federal court to hold that the plaintiff was entitled under state law to an oil drilling permit. <u>Burford</u>, 319 U.S. at 316-17. The state's administrative regime committed all such licensing decisions to a specialized agency which was charged with (1) maintaining oil prices at profitable levels and (2) ensuring an equitable allocation of oil withdrawal amongst licensees and potential licensees. <u>Id.</u> at 318-26. In these circumstances, exercising federal jurisdiction over individual decisions to grant or deny drilling licenses would usurp the state agency's role as the centralized manager of an important natural resource.

Here, Kia does not seek to challenge the fact-intensive decision making of an administrative body over an important policy issue. This court is not being asked to step into the Board's shoes and render a determination as to the lawfulness of defendants' conduct under RSA 357-C. Indeed, chapter 357-C primarily regulates the conduct of new motor vehicle manufacturers such as Kia, and not their dealers or franchisees. <u>See, e.g.</u>, RSA 357-C:9.  The Board is only empowered to hear claims arising under chapter 357-C, <u>see</u> RSA 357-C:12, I(a), and does not have jurisdiction to determine whether a franchisee's conduct toward its manufacturer violated

federal law, or gives rise to common law liability. Nor does the exercise of federal
jurisdiction over Kia's claims threaten the creation of inconsistent regulatory
regimes in an area in which centralized review is paramount, as demonstrated by,
among other things, RSA 357-C:12, IX's express carveout for civil actions to enforce
the provisions of the chapter. See FDIC v. Sweeney, 136 F.3d 216, 219 (1st Cir.
1998) (finding Burford abstention inappropriate where "there is no unified state
administrative apparatus to disrupt"); Gray v. Gray, 675 F. Supp. 3d 213, 221
(D.N.H. 2023) (declining to remand removed trusts-and-estates petition where
plaintiff failed to show that his claims "bear on policy issues [of] public import or
that adjudication in federal court would disrupt New Hampshire policy related to
trust administration").

    If more were needed, the Supreme Court has made clear that it is
appropriate to dismiss an action under Burford "only where the relief being sought
is equitable or otherwise discretionary." Quackenbush, 517 U.S. at 731. Where a
plaintiff seeks only damages, dismissal under Burford may not be had.[8] Id. In this
case, although the prayer for relief in Kia's complaint includes a boilerplate
provision requesting an award of any relief that "is just and proper under the
circumstances," doc. no. 1 at 47, the complaint does not seek any specific form of
equitable relief, and Kia made clear in its Rule 12 briefing that it seeks only

---

    [8]  In Quackenbush, the Supreme Court left open the possibility that an
"abstention-based stay" could be warranted in damages actions, assuming the other
Burford requirements are met. 517 U.S. at 731. Here, defendants' motion seeks a
dismissal, not a stay.

damages, see doc. no. 25-1 at 27. Burford abstention is inapplicable for this reason as well.

In light of the foregoing, Burford abstention is not warranted.[9]

IV.    Exhaustion is Inapplicable

Defendants argue that Kia's claims against DMO Concord and DMO North Hampton must be dismissed because Kia failed to exhaust its administrative remedies as to those claims. As with its Burford argument, defendants contend that the Board has exclusive authority to resolve any disputes between motor vehicle manufacturers and their dealers that fall within the purview of chapter 357-C. Defendants' argument fails for several basic reasons.

First, there is no exhaustion requirement for civil RICO actions. Molina v. Union Independiente Autentica de la AAA, 555 F. Supp. 2d 284, 302 (D.P.R. 2008); City of New York v. Joseph L. Balkan, Inc., 656 F. Supp. 536, 543 (E.D.N.Y. 1987). Defendants point to Roe v. Baker, 624 F. Supp. 3d 52 (D. Mass. 2022), but that case is inapposite. The plaintiffs in that case brought claims arising under the Individuals with Disabilities Education Act ("IDEA") and its regulations, the Rehabilitation Act, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1983 for alleged constitutional violations, and RICO. 624 F. Supp. 3d at 57-58. The court dismissed all but the RICO claims on exhaustion grounds, finding that those claims sought relief available under the IDEA (which, unlike RICO, contains an

_____

[9] The undersigned recognizes that the District of Massachusetts reached a different conclusion regarding Burford abstention in the DMO Norwood action. See DMO Norwood, 2023 WL 2021321, at *4 n.5.

exhaustion requirement). Id. at 60; see also Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 29 (1st Cir. 2006) ("We hold that where the underlying claim is one of violation of the IDEA, plaintiffs may not use § 1983—or any other federal statute for that matter—in an attempt to evade the limited remedial structure of the IDEA."). The court also dismissed the RICO claim, but not on exhaustion grounds. See id. at 60-61 (dismissing the "alleged violations of the IDEA and its regulations, the Rehabilitation Act, the ADA, and § 1983 . . . because [plaintiffs] have failed to exhaust the applicable administrative remedies" but dismissing the RICO claim for failure to state a claim).

Second, while it is sometimes impermissible to bring a cause of action under one statute to evade an exhaustion requirement imposed by another, see, e.g., Diaz-Fonseca, 451 F.3d at 28, chapter 357-C does not contain an exhaustion requirement, as discussed above. Third, defendants cite no authority for the proposition that Kia's claims arising under state common law are subject to an exhaustion requirement, and the court is not aware of any such authority.[10] For these reasons, defendants fail to show that Kia's claims should be dismissed on exhaustion grounds.

---

[10] The few cases defendants cite involve causes of actions subject to express exhaustion requirements. See Jorge v. Rumsfeld, 404 F.3d 556 (1st Cir. 2005) (Title VII); Innocent v. HarborOne Bank, 319 F. Supp. 3d 571 (D. Mass. 2018) (Title VII); Roe, 624 F. Supp. 3d at 52 (IDEA); Levine v. U.S. Dep't of Fed. Bureau of Prisons, Civ. No. 20-cv-11833-ADB, 2021 WL 681689 (D. Mass. Feb. 22, 2021) (28 U.S.C. § 2241)

V.    Kia's Claims Against DMO Norwood Are Barred by Res Judicata

The court finally addresses the parties' arguments regarding the preclusive effect of the Massachusetts action upon Kia's claims against DMO Norwood in this action. Because the District of Massachusetts was sitting in diversity, Massachusetts law governs the preclusive effect of that action upon this one. Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 508 (2001); Hatch v. Trail King Indus., Inc., 699 F.3d 38, 44 (1st Cir. 2012). Kia contends, however, that Massachusetts courts determine the preclusive effect of federal court judgments using federal res judicata principles. Because the result of this court's res judicata analysis would be the same regardless of whether federal or Massachusetts law applies, the court will refer to federal and Massachusetts authority alike. See Hatch, 699 F.3d at 44-45, 47 (explaining that a res judicata analysis would be the same under federal or Massachusetts law because "Massachusetts courts apply res judicata in a thoroughly conventional way" and they follow the Restatement (Second) of Judgments (quoting Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 54 (1st Cir. 2008))).

"The term 'res judicata' includes both claim preclusion and issue preclusion." Kobrin v. Bd. of Registration in Med., 832 N.E.2d 628, 634 (Mass. 2005). Only claim preclusion is at issue here. "Claim preclusion makes a valid, final judgment conclusive on the parties and their privies, and prevents relitigation of all matters that were or could have been adjudicated in the action." Id. (quoting O'Neill v. City Manager of Cambridge, 700 N.E.2d 530, 532 (1998)). Claim preclusion applies when (1) a prior proceeding reached a final judgment on the merits; (2) there is "sufficient

identicality between the causes of action asserted in the earlier and later suits"; and (3) there is "sufficient identicality between the parties in the two actions." Hatch, 699 F.3d at 45 (quoting Breneman v. U.S. ex rel. FAA, 381 F.3d 33, 38 (1st Cir. 2004)); accord Kobrin, 832 N.E.2d at 634. There is no dispute that the first and third elements are satisfied. The parties' dispute turns on whether the counterclaims Kia brought (and sought leave to bring) in the Massachusetts action and its claims against DMO Norwood in this case are the same.

"Massachusetts deems causes of action identical for claim preclusion purposes if they 'grow out of the same transaction, act, or agreement, and seek redress for the same wrong.'" Andrew Robinson Int'l, 547 F.3d at 52 (brackets omitted) (quoting Brunson v. Wall, 541 N.E.2d 338, 341 n.9 (Mass. 1989)). It is plain that the breach-of-contract counterclaim Kia brought against DMO Norwood in the Massachusetts action, as well as the additional counterclaims Kia sought leave to bring against DMO Norwood in that action, arose from the same nucleus of operative facts as Kia's claims against DMO Norwood in this case: DMO Norwood's participation in an alleged scheme to submit fraudulent RDRs to obtain incentive payments to which it was not entitled. However, Kia contends that its claims against DMO Norwood are not precluded because the District of Massachusetts denied Kia leave to amend its answer to assert most of its counterclaims. According to Kia, the fact that the District of Massachusetts did not grant Kia leave to assert most of its counterclaims means that Kia should have the opportunity to assert those claims in this case.

"[C]laim preclusion doctrine requires a party to live with its strategic choices." Hatch, 699 F.3d at 45 (brackets omitted) (quoting Airframe Sys., Inc. v. Raytheon Co., 601 F.3d 9, 11 (1st Cir. 2010)). If a party seeks leave to amend a pleading to include additional claims and elects not to appeal the denial of leave to amend, "the party 'is not entitled to a second opportunity in a later action to litigate the claim[s]' that the party sought to add." Id. (brackets omitted) (quoting Airframe Sys., 601 F.3d at 16). This principle is well-settled. See id. at 45-46 & n.7 (collecting cases); see also 18 Edward H. Cooper, Federal Practice & Procedure § 4412 (3d ed.). The First Circuit has held that the Supreme Judicial Court of Massachusetts would adhere to this principle. See Hatch, 699 F.3d at 47.

Here, Kia moved for leave to amend its answer in the Massachusetts action to bring counterclaims against DMO Norwood for civil RICO, RICO conspiracy, fraud, negligent misrepresentation, conversion, civil conspiracy, and breach of contract. The District of Massachusetts granted Kia's motion with respect to its proposed breach-of-contract counterclaim but otherwise denied it, finding that such a major expansion of the case's scope so close to the original bench trial date would be unfairly prejudicial to DMO Norwood (and in the alternative, that Burford abstention applied). DMO Norwood, 2023 WL 2021321, at *4 & n.5. Kia could have appealed that ruling if it litigated the case to judgment. United States v. Univ. of Mass., Worcester, 812 F.3d 35, 44 n.7 (1st Cir. 2016). Instead, Kia entered into a settlement agreement with DMO Norwood and stipulated to the case's dismissal

with prejudice. Claim preclusion requires Kia to live with this choice. Hatch, 699 F.3d at 45.

Kia argues that the rule discussed in Hatch applies only when leave to amend is denied on grounds of untimeliness. Although the First Circuit emphasized the movant's unjustified delay in Hatch, the "well-accepted principle" the court discussed and applied in Hatch does not require that leave to amend be denied on grounds of untimeliness. Id. at 45. Rather, the First Circuit made clear the rule is generally applicable: "When a party chooses to move for leave to amend its complaint and then not to appeal denial of that motion, the party 'is not entitled to a second opportunity in a later action to litigate the claim[s]' that the party sought to add." Id. (brackets omitted) (quoting Airframe Sys., 601 F.3d at 16). "Any error should be corrected by appeal in the first proceeding." Id. (emphasis added) (quoting Cooper, supra). The court is not persuaded that the rule set forth in Hatch only applies when leave to amend was denied on untimeliness grounds.

Hatch did leave open the possibility, however, that this rule may not apply when there is "some strong countervailing interest." Id. at 46. Kia argues that fairness and policy considerations present such countervailing interests here. The court agrees that the result is a harsh one for Kia. Nonetheless, the doctrine of res judicata requires Kia to live with the consequences of its choice to settle the Massachusetts action.[11] Kia had an "incentive and opportunity to [fully] litigate" the

---

[11] The doctrine of claim preclusion bars claims in a subsequent action if they "grow out of the same transaction, act, or agreement, and seek redress for the same

39

denial of leave to amend through an appeal. Kobrin, 832 N.E.2d at 634 (quoting

O'Neill, 700 N.E.2d at 532). The First Circuit has explained that the likely res

judicata effect of an order denying leave to amend would be a "powerful factor in

favor of reversal" on appeal, especially considering Rule 15's requirement that leave

to amend be freely given when justice so requires. Johnson v. SCA Disposal Servs.

of New England, Inc., 931 F.2d 970, 976 n.19 (1st Cir. 1991). Moreover, fairness

concerns cut both ways: claim preclusion "is based largely on the ground that

fairness to the defendant, and sound judicial administration, require that at some

point litigation over the particular controversy come to an end." Restatement

(Second) of Judgments § 19 cmt. a (1982).

    For these reasons, Kia's claims against DMO Norwood are barred by res

judicata.

---

wrong," as claims in the prior action. Andrew Robinson Int'l, 547 F.3d at 52 (brackets
omitted) (quoting Brunson, 541 N.E.2d at 341 n.9). Here, while the District of
Massachusetts denied Kia leave as to most of its counterclaims, it did permit Kia to
bring its breach-of-contract counterclaim against DMO Norwood, and that
counterclaim grew out of the same nucleus of operative facts as Kia's claims against
DMO Norwood in this action. Even if the breach-of-contract counterclaim was the
only one that Kia sought leave to bring in the Massachusetts action, claim preclusion
would bar the litigation of claims growing of the same factual transaction in this
action, whether they had been raised earlier or not. Moreover, this is not a situation
where the court in the first action lacked jurisdiction over claims asserted in a
subsequent action. See Cooper, supra.

## CONCLUSION

Doc. no. 21 is denied, and doc. no. 19 is granted. DMO Norwood is dismissed as a defendant from this case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

March 31, 2025

cc:     Counsel of Record

41